# EXHIBIT F

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 2 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE NORTHERN DISTRICT OF ILLINOIS

 3

 4   BRAD SANDEFUR,                 )

 5             Plaintiff,      )

 6     vs.                       ) No. 17-CV-2048

 7   SHERIFF OF COOK COUNTY       )

 8   THOMAS J. DART, et al.,      )

 9             Defendants.       )

10

11

12

13      The discovery deposition of DEPUTY CHIEF

14   THEODORE JOHN STAJURA, taken in the above-entitled

15   cause, before Deralyn Gordon, a notary public of

16   Cook County, Illinois, on the 28th day of June,

17   2018, at 206 South Jefferson Street, Suite 100,

18   Chicago, Illinois, beginning at approximately

19   10:35 AM, pursuant to Notice.

20

21

22

23   REPORTED BY:  DERALYN GORDON, CSR, RPR, CRR

24   LICENSE NO:  084-003957
```

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 3 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

```
 1      PRESENT:

 2

 3

 4          HERBERT LAW FIRM

 5          BY ELIZABETH FLEMING, ESQ.,

 6          206 South Jefferson, Suite 100

 7          Chicago, Illinois  60661

 8          (312) 655-7660

 9          elizabeth.fleming@danherbertlaw.com

10              appeared on behalf of plaintiff;

11

12          COOK COUNTY STATE'S ATTORNEY

13          BY LYLE HENRETTY, ESQ.,

14          69 West Washington, 13th Floor

15          Chicago, Illinois  60602

16          (312) 603-1426

17          lyle.henretty@cookcountyil.gov

18              appeared on behalf of defendants

19              and deponent.

20

21

22

23

24
```

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 4 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

```
 1                    I N D E X

 2                    VOLUME I

 3

 4   Wednesday, June 28, 2018

 5

 6   WITNESS                          EXAMINATION

 7   DEPUTY CHIEF THEODORE JOHN STAJURA

 8        By Ms. Fleming                  5, 89

 9        By Mr. Henretty                 86

10

11

12

13           DEPOSITION EXHIBITS

14      DEPUTY CHIEF THEODORE JOHN STAJURA

15      ALL EXHIBITS RETAINED BY ATTORNEY FLEMING

16

17   NUMBER           DESCRIPTION          IDENTIFIED

18    1     Cook County Sheriff's Police      43
            Department Memorandum
19          SANDEFUR/DART3

20    2     Sheriff's Office of Cook County   43
            Internal Affairs/Inspector General
21          Complaint Register
            SANDEFUR/DART138 - SANDEFUR/DART139
22
      3     Letter from Jonathan Myslinski to  51
23          Dana Wright dated 7/27/15
            SANDEFUR/DART135
24
```

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 5 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

```
 1                  DEPOSITION EXHIBITS

 2           DEPUTY CHIEF THEODORE JOHN STAJURA

 3        ALL EXHIBITS RETAINED BY ATTORNEY FLEMING

 4

 5    NUMBER           DESCRIPTION            IDENTIFIED

 6      4     Cook County Sheriff's Police        63
              Department Memorandum dated 9/3/15
 7            SANDEFUR/DART4 - SANDEFUR/DART7

 8      5     Memorandum of Investigation        65
              dated 8/13/15
 9            SANDEFUR/DART26 - SANDEFUR/DART28

10      6     Cook County Sheriff's Police        74
              Department memorandum dated 9/17/15
11            SANDEFUR/DART33

12      7     Cook County Sheriff's Office        81
              OPR
13            SANDEFUR/DART000452 -
              SANDEFUR/DART000453
14

15

16

17

18

19

20

21

22

23

24
```

Deputy Chief Theodore John Stajura - 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 6 of 43 PageID #:491

1      (Whereupon the witness was
2   sworn.)
3      MS. FLEMING:  Let the record reflect
4   that we're taking the deposition of Deputy Chief
5   Theodore Stajura in the matter of Sandefur versus
6   Dart.
7      This deposition is taken pursuant to
8   notice, properly served in accordance with
9   all applicable rules, and by agreement of the
10  parties.
11     DEPUTY CHIEF THEODORE JOHN STAJURA
12  called as a witness herein, having been first duly
13  sworn, was examined and testified as follows:
14     EXAMINATION
15  BY MS. FLEMING:
16  Q.   Deputy Chief Stajura, can you please
17  state and spell your first and last names.
18  **A.   Sure.  The first name is Theodore,**
19  **T-h-e-o-d-o-r-e, middle initial J., John, and**
20  **the last name is Stajura, S-t-a-j-u-r-a.**
21  Q.   Thank you.
22     Have you been deposed before?
23  **A.   I have.**
24  Q.   How many times have you been deposed?

Page 5

1   assume you understood it, and that you answered
2   it fully, accurately, and to the best of your
3   knowledge; is that fair?
4   **A.   Yes.**
5   Q.   And if you need to take a break at any
6   time, by all means, just request a break.
7      The only thing I'd ask is that, if
8   there's a question pending, you answer the
9   question, and then we'll follow up with a break.
10  Okay?
11  **A.   Yes.**
12  Q.   All right.
13     Is there any reason your ability to
14  answer questions fully, truthfully, and accurately
15  today might be impaired?
16  **A.   No.**
17  Q.   And did you speak with anyone generally
18  about your deposition today, apart from counsel?
19  **A.   No.**
20  Q.   And did you review any documents in
21  preparation for this deposition?
22  **A.   Yes.**
23  Q.   And what documents did you review?
24  **A.   I reviewed the entire investigative packet**

Page 7

1   **A.   Over a dozen.**
2   Q.   And what types of cases?
3   **A.   Lawsuits.**
4   Q.   And do you recall when you were deposed?
5   **A.   Throughout my career.**
6   Q.   And were you a witness?
7   **A.   Yes, witness.**
8   Q.   I'm going to go over a couple of
9   ground rules.  The most important is that
10  questions will be asked out loud, and you need
11  to respond with a verbal response.
12     Nods of the head, uh-huhs, uh-uhs, are
13  not something that the court reporter can take
14  down.  Is that okay?
15  **A.   Yes.**
16  Q.   All right.
17     You may anticipate my question, but
18  please wait until I finish so that we don't
19  talk over each other, and I'll try to do the
20  same for you.
21  **A.   Okay.**
22  Q.   And if you don't understand a question,
23  please ask me to repeat it or rephrase it.
24     If you answer a question, I'm going to

Page 6

1   **pertaining to this matter.**
2   Q.   And when did you review that?
3   **A.   Yesterday.**
4   Q.   And I don't mean to be offensive with this
5   next question, but I have to ask.
6      Have you ever been convicted of a crime?
7   **A.   No.**
8   Q.   Okay.  All right.
9      So I want to discuss your education
10  background first, and then we'll move into the
11  lawsuit and the allegations.
12     Did you attend high school?
13  **A.   Yes.**
14  Q.   What high school did you attend?
15  **A.   St. Lawrence in Burbank, Illinois.**
16  Q.   And did you graduate?
17  **A.   Yes.**
18  Q.   When did you graduate?
19  **A.   1985.**
20  Q.   And what did you do after graduation?
21  **A.   After graduation I went out to college.**
22  Q.   And where did you go to college?
23  **A.   Lewis University in Romeoville.**
24  Q.   And what was your major?

Page 8

Deputy Chief Theodore John Stajura - 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 7 of 43 PageID #:491

**Page 9**

1  A.  Criminal social justice, and I received
2  a minor in public administration.
3  Q.  And when did you graduate?
4  A.  That was 1990.
5  Q.  And what did you do after you graduated?
6  A.  After I graduated I was working in
7  the private sector, loss prevention and
8  administrative investigations.
9  Q.  And where did you work loss prevention?
10  A.  I worked for Jewel when I was in
11  college, and then I had an opportunity to go to
12  a bigger company.  It was called Phar-Mor; they're
13  no longer in existence.  They're based out of
14  Youngstown, Ohio.
15  Q.  And approximately how long did you work
16  for Phar-Mor?
17  A.  Maybe two, two and a half years.
18  Q.  And what was your title?
19  A.  When I left there, I was the
20  Loss Prevention Manager.
21  Q.  And why did you leave there?
22  A.  I had an opportunity to get into
23  law enforcement.
24  Q.  And did you attend any graduate or

**Page 10**

1  professional school?
2  A.  Yeah.  I've -- I have my master of
3  science in public safety administration from
4  Lewis University.
5  Q.  And when did you obtain that?
6  A.  2003.
7  I've been to the Chicago Police Detective
8  Academy.  I've been to the FBI National Academy,
9  2002.
10  Q.  Any others?
11  A.  Northwestern, staff executive management
12  training.
13  Q.  And when was that approximately?
14  A.  2007 maybe, 2008.
15  Q.  Anything else?
16  A.  (Indicating.)
17  Q.  Okay.
18  A.  I'm sorry.  No.
19  Q.  Okay.
20  You mentioned that you left Phar-Mor
21  because you had an opportunity in law enforcement.
22  What law enforcement was that?
23  A.  The Cook County Sheriff's Office.
24  Q.  Approximately what year?

**Page 11**

1  A.  I became a Correctional Officer in 1992.
2  Q.  And what was your assignment as a
3  Correctional Officer?
4  A.  I started out -- I know they changed it
5  around.
6  But I started off as a cadet, which I
7  was working in Division Eight, which was the
8  psych ward, as a cadet.  Then I was there
9  approximately four months.  Then they put us into
10  the academy.
11  I was valedictorian of my class, so
12  I was -- I had an opportunity to select my
13  assignment.  So I selected external operations,
14  which was outside security.
15  Q.  And when did you start in external
16  operations?
17  A.  1992.
18  Q.  And what were your duties and assignments?
19  A.  We had prisoner escorts to the hospital,
20  we had prisoner watch at the various hospitals,
21  we had perimeter security, and we also had
22  citizen checks of people coming and going from
23  the Department of Corrections.
24  Q.  And approximately how long did you stay in

**Page 12**

1  external operations?
2  A.  I was a Correctional Officer for two years
3  total.
4  Q.  Okay.
5  So that would be approximately '94?
6  A.  Yes.
7  Q.  And where did you go after?
8  A.  I was selected to become a police officer
9  for the Cook County Sheriff's Police.
10  Q.  And what is the selection process for?
11  A.  It in a sense changed.  We're talking
12  almost 25 years ago.
13  But every two years a Correctional Officer
14  or Deputy Sheriffs, through the Cook County
15  Sheriff's Merit Board, had an opportunity to take
16  a written examination.
17  Once the written examination is provided,
18  then the scores were posted, or the passing
19  individuals were put on the list, and then
20  selections was made.  And I don't know how they
21  made those selections.
22  Q.  Okay.
23  And after you were selected for the
24  position of police officer, did you have to

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 8 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  go through any type of subsequent testing apart
2  from the written examination?
3      A.  Yes.  We had to take a power test, which
4  is the state's certified, the same power test
5  that's currently in place.
6      Q.  Okay.
7      A.  They call it the power test.
8      Q.  And anything else?
9      A.  We had to write an essay, from what
10 I recall, and then there was actually an
11 oral interview with some Command staff members of
12 the Sheriff's Police Department.
13     Q.  And then upon successfully completing
14 the power test, completing the essay and
15 oral interview, what happens next?
16     A.  At that point we got contacted by phone.
17 And there was just a small amount of individuals
18 that were selected.  Even though the list was good
19 for two years, I believe in our academy there was
20 only seven individuals that were selected at that
21 time.
22     Q.  Small.
23     A.  Now, there was other municipalities in
24 there, but only seven Sheriff's Police.

Page 13

1      Q.  Okay.
2          So approximately when did you begin the
3  Sheriff's Police Training Academy?
4      A.  January of 2014.  I'm sorry, January of
5  1994.
6      Q.  It's okay.
7      A.  Sorry.
8      Q.  And approximately how long was the
9  Sheriff's Training Academy?
10     A.  Ten weeks at the time.
11     Q.  And upon completion of the training
12 academy, where did you go?
13     A.  We are then assigned to what they call
14 the field training officer program.  And I had
15 various training officers that I was assigned to
16 throughout the county, the north part of the
17 county as well as the south.
18     Q.  And approximately how long is the
19 field training officer program?
20     A.  Twelve weeks.
21     Q.  And after the twelve-week field
22 training officer program, where did you go then?
23     A.  At that point if we successfully complete
24 and pass the field training program, we're then

Page 14

1  given our assignments.
2          I was assigned to the north area of
3  the county, which was the Rolling Meadows Court
4  District.
5      Q.  And what were your duties and
6  responsibilities as a police officer in the
7  Rolling Meadows District?
8      A.  Handling calls for police service,
9  assisting citizens, motor related, conducting
10 accident investigations, criminal investigations,
11 and traffic enforcement.
12     Q.  And approximately how long were you
13 assigned to the north area of Rolling Meadows?
14     A.  Approximately one year.
15     Q.  And where were you assigned next?
16     A.  Every year they have an annual bid for
17 the Patrol Division.
18          So I was able to bid at that point, and
19 I successfully bidded for the south area.
20     Q.  And what's the bidding selection?
21     A.  How they were doing it at the time is
22 they would identify all of the individuals
23 that were currently in the Patrol Division,
24 any police officers that had an interest that

Page 15

1  were in a specialized unit coming back to patrol,
2  they would send out notification, they would rank
3  everybody by seniority.
4          And then at a certain time you had to
5  call in to a number, and, based on your seniority,
6  they would tell you what was available at that
7  point.
8          So, again, since I was a junior
9  police officer, I basically got the scraps.
10     Q.  And when you bid to the south area,
11 or Area South, you were still a police officer;
12 correct?
13     A.  Yes.
14     Q.  And how long were you in that?
15     A.  I was in the south area for approximately
16 one year.
17     Q.  And then where were you assigned next?
18     A.  At that point, this was, like, 1996,
19 the Department started a new unit, the
20 Truck Enforcement Unit, and I was selected to
21 be one of the Truck Enforcement Officers for
22 the Department.
23     Q.  And does the Department still have the
24 Truck Enforcement Unit?

Page 16

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 9 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1 A. Yes.
2 Q. And what exactly is the Truck Enforcement
3 Unit?
4 A. You go out, and you conduct overweights
5 and safety enforcement for commercial motor
6 vehicles.
7 Q. And approximately how long were you
8 in that unit?
9 A. I was in that unit approximately
10 two years.
11 Q. So roughly '98?
12 A. In '98 I was promoted to sergeant.
13 Q. And at that time what was the
14 promotion system with respect to the sergeants?
15 A. It was the same as a police officer.
16 Every two years there was a written examination,
17 the exam was given independently by our
18 Cook County Sheriff's Merit Board, the test
19 was graded, and then a list was posted of
20 the individuals that made the list.
21     From there, again, I don't know how the
22 selection was made.
23 Q. Okay.
24     And what type of training did you

Page 17

1 Q. And where were you assigned?
2 A. As a new sergeant, I was assigned to the
3 south area, Markham District.
4 Q. And what were your duties and
5 responsibilities?
6 A. Direct supervision of a shift,
7 usually consisting of anywhere from six to
8 ten police officers, supervisory oversight
9 for arrests, for accident investigations, for
10 traffic enforcement.
11     There were additional supervisory
12 responsibilities for time sheets, use of force,
13 department accident investigations, citizen
14 complaints involving misconduct on the part of
15 sworn department members, and any other
16 duties that the Command staff felt needed to
17 be handled.
18 Q. And how long were you in the
19 Markham District as a sergeant?
20 A. Approximately six months.
21 Q. And where did you go next?
22 A. From there I was contacted, and
23 I was transferred to the Special Operations
24 Vice Unit.

Page 19

1 receive when you were promoted to sergeant?
2 A. I was required to ride with a sergeant,
3 again, as, like, a supervisory field training
4 program. So I was riding with another sergeant.
5     I also went to Northwestern Supervision,
6 a police personnel class to gear you into the
7 position of taking on a supervisory role.
8 Q. And approximately how long was the
9 Northwestern class?
10 A. Two weeks.
11 Q. And the field training portion with
12 respect to riding with a sergeant, how long
13 was that?
14 A. That was approximately a month. However,
15 if the department, the Command staff, felt that
16 you were ready, they could cut you loose earlier.
17 Q. So they could use their discretion if
18 they --
19 A. Yes.
20 Q. Okay.
21     Did you ride with the sergeant for a month
22 or was --
23 A. I did ride with a sergeant, but it wasn't
24 a month. It was approximately two weeks.

Page 18

1 Q. And what's the Special Operations
2 Vice Unit?
3 A. It was a bunch of units consisting of
4 child exploitation, vice. And Special Operations
5 did electronic, like, technical investigations,
6 cameras, teletrackers.
7 Q. And, for the record, can you state what
8 "vice" means?
9 A. Vice, I mean, the bottom line is it's
10 the street crimes. So it's prosecution, gambling,
11 extortion, organized-crime investigations.
12 Q. And you were transferred as a sergeant
13 to that unit?
14 A. Yes.
15 Q. Did you receive any special training?
16 A. I received special training within
17 the unit, on-the-job training.
18 Q. And what was that training?
19 A. Riding with more seasoned supervisors,
20 going out on assignments with investigators. So,
21 again, not working in the capacity prior.
22     I didn't have any working knowledge of
23 the operation. So I initially worked with
24 the supervisors to get an understanding of

Page 20

**Deputy Chief Theodore John Stajura - 6/28/2018**
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 10 of 43 PageID #:491
**Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.**

1 how the unit day-to-day operations ran.
2     And then, once I felt comfortable, then
3 I would jump in the car with the investigators and
4 handle the investigations accordingly.
5   Q.  And the investigators that are assigned to
6 this unit, are they sworn police officers for --
7   A.  Yes, they are.
8   Q.  And how long were you in that unit for
9 approximately?
10   A.  Approximately two years.
11   Q.  And where did you go next?
12   A.  While I was in that unit, I was placed
13 as a supervisor, which was kind of unique at
14 the time.  I was selected to attend the Chicago
15 Police Detective Academy.  It was an eight-week
16 program at the time.
17     I graduated on a Friday, and that same day
18 I was transferred to Internal Affairs.
19   Q.  Do you know who made that decision?
20   A.  The Chief's office.  I don't know.  I
21 mean, it was Command staff.
22   Q.  And what were your duties and assignments?
23   A.  As an Internal Investigator, I conducted
24 citizen misconduct complaints.  There's various

Page 21

1 levels.
2     We would receive on an average of
3 three to five citizen complaints a day on
4 the various range of rude and discourteous all
5 the way to potential criminal investigations.
6   Q.  And what was your job title?
7   A.  I was at -- when I went in initially,
8 I was a Police Sergeant.
9   Q.  And how long were you in this unit?
10   A.  I was in the unit for four years.
11   Q.  And when you left, what was your title?
12   A.  During the course of that, just to
13 give you a little further background, there
14 was a lot of misconduct complaints involving
15 Command staff members.
16     One of the concerns that the
17 Chief's Office had was a ranking sergeant
18 conducting investigations on lieutenants,
19 commanders, and whatnot.
20     At that point a decision was made,
21 again, by the Chief's Office, the Command staff,
22 to create the appointed position of Inspector,
23 Police Inspector.  These were exempt positions.
24     So even though I held the merit rank

Page 22

1 of Sergeant, I was given gold star, and I had
2 the full authority of the First Deputy Chief's
3 Office.  So that allowed myself and my partner
4 to conduct administrative investigations on
5 higher-ranking individuals.
6   Q.  And approximately when did this occur in
7 that four-year span?
8   A.  That happened immediately.
9     So I got in the unit about 2000.  And
10 in the later part of 2000, that decision was made.
11   Q.  And how many investigations did you
12 conduct?
13   A.  In that time frame well over 100.
14   Q.  And where did you go next?
15   A.  While I was in that unit, I was
16 promoted to the merit rank of Lieutenant,
17 and I maintained my appointed rank of
18 Police Inspector.
19     At 2004 my boss retired.  He had an
20 opportunity to work on a special assignment for
21 the Sheriff's Office with the U.S. Marshals.  So
22 at that point I stepped down from my position
23 as Inspector, went back to my merit rank as
24 Lieutenant, and was working with the U.S. Marshals

Page 23

1 Task Force.  That was in 2004.
2   Q.  And what were your duties and
3 responsibilities while working with the
4 U.S. Marshals Task Force?
5   A.  We were going after individuals that
6 were wanted on high-profile crimes, murder,
7 sexual assault, armed robberies, warrants
8 through the Chicago Police Department, the
9 Cook County Sheriff's Office, as well as
10 federal warrants.
11   Q.  Okay.
12     So it was sort of like a fugitive
13 apprehension team?
14   A.  Yes.  Exactly.
15   Q.  And approximately how long did you
16 remain in this role?
17   A.  Well, in that role with the Marshals was
18 one year.
19     The team continued for an additional year,
20 because our funding was through the HIDTA, which
21 is the High Intensity Drug Trafficking I believe
22 is the adage for it, so we were a federally-funded
23 operation.
24     We then were federally funded through

Page 24

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 11 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1 HIDTA, my boss was. Our salaries were still
2 coming from the Sheriff's Office. The
3 HIDTA funding dried up that year, and at
4 the end of the year, we were moved back to
5 the police department.
6    Q. So this is in 2005?
7    A. Closer to 2006.
8    Q. And then what happened next?
9    A. In 2006 when the funding dried up,
10 I returned to my merit rank as Police Lieutenant.
11 I was then assigned to the patrol division as
12 lieutenant.
13    Q. And what patrol division?
14    A. Because of the rank of lieutenant,
15 it is limited. There isn't a lot. It was, like,
16 a county-wide lieutenant.
17    Q. Okay.
18    A. So I covered, depending on the need,
19 either north area, south area, or the entire
20 county.
21    Q. And what were your duties?
22    A. Direct supervision of the sergeants
23 working, depending on what my assignment was,
24 whether it was countywide, it would be all of

Page 25

1 the sergeants, if it was area-wide, then it
2 would be a limited amount of sergeants. So
3 I would have direct supervision over them. And
4 then I would make sure that roll call was being
5 conducted.
6    Again, if there was any accidents,
7 use of force, citizen complaints, pay roll,
8 overtime requests, vacation requests, more
9 administrative.
10    Q. And did you receive any training?
11    A. No. It was basically on-the-job training.
12    Q. And how long were you the lieutenant for
13 the patrol division?
14    A. Approximately six months.
15    Q. And where did you go next?
16    A. At that point I was asked to run the
17 Cook County Sheriff's Police Department Fugitive
18 Warrants unit, which was also associated now with
19 the U.S. Marshals Office.
20    Q. I'm sorry, you said the fugitive
21 warrant...
22    A. So the entire -- the Cook County Sheriff's
23 Police Fugitive Warrant Unit, I was the Commanding
24 Officer as Lieutenant.

Page 26

1    Q. Okay.
2    And what is that unit?
3    A. That unit, every criminal warrant
4 pertaining to the Sheriff's Office was my
5 responsibility.
6    So I had civilian clerks working for me
7 that would work closely with the judges and
8 the clerks and the courthouses entering warrants,
9 quashing them.
10    I had a division of deputies that would
11 do local prisoner pickups and extraditions up
12 to 250 miles, which would include going out of
13 state.
14    It had a large team of
15 street investigators that, again, were assigned to
16 the U.S. Marshals. So all of the individuals
17 had federal credentials, and they were a part of
18 the U.S. Marshals Task Force.
19    I also had supervisors that were assigned
20 to me, and I was also responsible for the 24-hour
21 fugitive desk.
22    The way the warrant are set up, any
23 warrant that's issued, it should be entered into
24 a local database or a national database. The desk

Page 27

1 was responsible 24 hours a day, seven days a week
2 to validate these warrants.
3    So if a municipal agency had somebody on
4 a traffic stop or they made an arrest and the
5 individual had a warrant, my desk was responsible
6 for confirming the validity of the warrant.
7    Q. And how many individuals were in this
8 unit?
9    A. Close to 60.
10    Q. And did you receive any training for this?
11    A. I received training through the
12 U.S. Marshals prior in part of the Fugitive
13 Apprehension Team from HIDTA prior, and my
14 years of experience as not only a police officer,
15 but also as a supervisor.
16    Q. And how long were you in this role for?
17    A. I ran the unit for five years.
18    Q. So approximately 2011, 2012?
19    A. 2012.
20    Q. Okay.
21    And where did you go in 2012?
22    A. From there I was asked -- there was
23 some restructure going on within the
24 sheriff's Office. I was to again pick up the

Page 28

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 12 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  role as the Police Inspector for the
2  Police Department.
3      Q.  And who were you asked by?
4      A.  At the time it was the First Deputy Chief
5  Mike Smith, and there was a titled person by
6  the name of John Conrad.  His title was Chief of
7  Staff.  So he answered directly to the Sheriff's
8  Executive Office.
9      Q.  And did you receive any training for this
10 role?
11     A.  Based on my four years of experience
12 prior, no.
13     Q.  Okay.
14         And what was your title?
15     A.  When I came back, I was titled as
16 Police Inspector.
17         I still held my merit rank as
18 Police Lieutenant.
19     Q.  And what was your duties and
20 responsibilities?
21     A.  The duties and responsibilities were a
22 lot different with -- again, you've got to realize
23 new sheriff, new mission, new focus.
24         My duties were conducting audits,

Page 29

1  administrative investigations, conducting
2  inspections.  We do that twice a year formally
3  where we inspect uniforms, equipment, and
4  vehicles.
5         We will do inspections of our
6  property room to make sure that they were
7  in compliance, and that there was no
8  misappropriation going on.
9         We also are responsible for violations
10 of attendance review.  So if somebody calls
11 in medical, let's say, and they don't have
12 medical time, they're in violation.  We're
13 responsible for that.
14         We are responsible for the tasers for
15 the Sheriff's Police Department.  We're also
16 responsible for the accidents.
17         So if an individual is involved in
18 an accident, whether it was chargeable or
19 not chargeable, we would work with our
20 Vehicle Services Section to make out the notice.
21 If it was chargeable, we would be responsible for
22 securing the discipline.
23         I worked very closely with the unions.
24 I am the individual for the Sheriff's Office that

Page 30

1  handle -- or for the Sheriff's Police Department
2  that handles all of the step one grievances.
3  So I work very closely with the Legal Department.
4  And we also conduct various types of
5  investigations.
6      Q.  And you mentioned that you were
7  responsible for the tasers; what did you mean
8  by that?
9      A.  Tasers are considered a weapon.  An
10 individual can't walk into a store, like
11 their duty weapon, and purchase a taser.
12         So, because they were department
13 equipment, we had to make sure that the
14 individuals were not only properly trained
15 in taser usage, but, if they had a deployment,
16 whether it was in the performance of their duty or
17 accidental, we were the oversight.
18     Q.  Okay.
19     A.  So we would take the taser, we would
20 hook it up to a computer, we would download it,
21 we would obtain the reports from the individuals
22 involved to make sure that it wasn't maliciously
23 done.
24         So we conducted many investigations on

Page 31

1  the taser deployments.
2      Q.  Okay.
3         So, essentially, it would be, you know,
4  ensuring that the department member is taser
5  trained, qualified, so to speak?
6      A.  Yes.
7      Q.  And then if there was an accidental
8  taser discharge or nonaccidental --
9      A.  We would investigate that, yes.
10     Q.  Okay.
11         And then you also mentioned accidents,
12 whether chargeable or not chargeable.
13     A.  Yes.
14     Q.  Are you referring to a
15 department-member-involved accident?
16     A.  Yes.
17     Q.  And is there a specific title for
18 this unit within the Police Department?
19     A.  Yes.  Initially it was titled the
20 Inspectional Services Section.
21         It's recently been changed based on
22 a restructuring of the Sheriff's Office.  The
23 current title is the Cook County Sheriff's
24 Police Department Office of Discipline,

Page 32

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 13 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1 Compliance, and Inspections.
2 Q. In 2015 was it considered Inspectional
3 Services?
4 A. 2015 it was the Inspectional Services
5 Section.
6 Q. And you mentioned that you
7 conduct multiple -- or various administrative
8 investigations.
9 What types of administrative
10 investigations?
11 A. There's various forms of investigations
12 that can be handled. One level that we handle
13 is a minor transgression, it's called on the
14 Sheriff's Police level a RESDA. On the other
15 areas of the Sheriff's Office it's called a
16 SPAR. It's a minor transgression, so we
17 would conduct investigations on those.
18 Or we would assist supervisory staff,
19 if they wanted to discipline, obtaining
20 memorandums, and making sure they were
21 covering the right policies, as well as being
22 fair if they were recommending some type of
23 discipline. All other investigations we conduct
24 are management inquiries.

Page 33

1 Now, our unit back when they were
2 in special services and currently
3 while the Department of Compliance, you know,
4 Discipline and Inspections, our overseers on
5 any of the discipline aspect is the Office of
6 Professional Review. They are the ones that
7 assign us the investigations.
8 Can we receive investigations from our
9 Chiefs? Yes.
10 But any formal investigations
11 we receive them from their office. They have
12 the first right of refusal on any administrative
13 investigation.
14 Q. And is there any other type of
15 investigation?
16 A. Yeah. I've conducted investigations
17 to assist the Legal Department with lawsuits.
18 We've had some special investigations where
19 we've assisted the Cook County State's Attorney
20 in obtaining evidence.
21 We have recently outfitted the
22 Sheriff's Office with body-worn cameras. So
23 not only do we issue those out, because
24 that instructor falls under my unit, we also

Page 34

1 do audits of those.
2 And we also conduct investigations to
3 make sure not only the individuals are using the
4 body-worn camera properly, but they are being
5 professional in the performance of interacting
6 with the citizens.
7 So if they're not turning on the camera
8 when they should, if they're not even having it
9 affixed properly, we'll conduct the minor
10 investigation on it, and we'll bring them in.
11 In some cases we'll notify their
12 supervisor, other times it will go all the way up
13 to their commander or their chief, depending on
14 the infraction. So we'll investigate that too.
15 Q. Okay.
16 And you're still in the -- this unit;
17 correct?
18 A. Yes.
19 Q. And what's your title today?
20 A. Deputy Chief.
21 Q. So walk me through your progression from
22 Police Inspector to Deputy Chief.
23 A. Okay. Again, I was asked to go back
24 into the unit in 2012. I conducted my duties,

Page 35

1 I guess, to the best of my ability.
2 And in January of 2016, I was
3 promoted/appointed to the rank of Deputy Chief.
4 Q. I apologize. I may have asked you this.
5 Did you receive any training when you went
6 back to this unit?
7 A. No.
8 Q. Okay.
9 A. Because I had the training already.
10 Q. Right.
11 A. But pertaining to newer things,
12 for instance, the body-worn cameras, I went to
13 special training for that, not only how they
14 operate, but how to conduct proper investigations,
15 tasers, how to use those properly.
16 So with the new added duties and
17 responsibilities, I received that type of
18 training.
19 But to conduct the investigations, I --
20 I had the working knowledge already, so no.
21 Q. Okay.
22 And in 2015 what was your title?
23 A. In 2015 I was a Police Inspector.
24 Q. And in 2015 approximately how many other

Page 36

Deputy Chief Theodore John Stajura - 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  police inspectors were in the unit?
2      A.   I was the only police inspector.
3          We had one Deputy Inspector, that was
4  Mike Goldsmith, he was getting ready to leave
5  the unit, and I had a sergeant at the time, that
6  was John Sullivan.
7      Q.   In 2015, generally speaking, how were
8  investigations conducted?  And, specifically,
9  how were management inquiries conducted?
10     A.   Management inquiries were assigned to
11 us by the Office of Professional Review.  We would
12 look at the allegations.
13         Management inquiries are a lot
14 different than department heads or formal
15 investigations.  We watched that very closely
16 following the Uniform Peace Officers' Act.
17         So these were inquiries.  We were
18 conducting interviews, looking into possible
19 policy violations, misconduct, or allegations
20 involving various forms of incidents where
21 we needed a followup or the Chief's Office
22 needed a determination of exactly what had
23 occurred.
24     Q.   And how are they different from

Page 37

1  Department Head investigations?
2      A.   Management inquiries, again, are issued
3  by the Office of Professional Review.  They are
4  just that, they are inquiries.
5          The way our agency is set up, the
6  Police Department, if a management inquiry is
7  sustained, the maximum discipline that could be
8  imposed is a three-day suspension.  That falls
9  in line with UPODA, the Uniform Peace Officers',
10 you know, Act, because anything over three days
11 would constitute a Department Head investigation.
12         A Department Head investigation is
13 considered a formal investigation where
14 allegations are given and formal statements
15 are taken.
16         In addition, discipline from 29 days to
17 termination could be presented on the Department
18 Head investigations.
19         The Department Head investigations and
20 the Office of Professional Review investigations
21 are similar.  The only difference is the
22 Department Heads are handled by the respective
23 agency, in our case the Police Department,
24 whereas in an Office of Professional Review

Page 38

1  investigation is conducted by one of their
2  investigators.
3      Q.   Okay.
4      A.   So it's the same paperwork, the same
5  type of formatting for conducting the
6  investigation, writing up the findings, and
7  everything is the same.
8      Q.   Do you know how it is the Office of
9  Professional Review will make the determination
10 that an investigation should be handled as a
11 management inquiry?
12     A.   A lot of times they will come in as
13 a management inquiry.  A lot of times they
14 will come in just as an allegation, a citizen
15 will call in, a to/from memorandum will be
16 generated by a supervisor.
17         They are, if they're sent to us, like
18 my unit, I will discuss it with the Office of
19 Professional Review, I'll explain to them what
20 I received, and then I'll send it to them.
21         Because, again, they will review it, and
22 they have the first right of refusal.  They can
23 either say we're going to take this or we're
24 going to assign this to you.  And that's how it

Page 39

1  works out.
2      Q.   Okay.
3          And you mentioned earlier that discipline
4  over three days would be a formal investigation.
5      A.   Yes.
6      Q.   Okay.
7          And that's where allegations are
8  presented?
9      A.   Yes.
10     Q.   And interviews are conducted?
11     A.   We use interviews in management inquiries.
12         The terminology is interrogation for the
13 Department Heads or the OPR investigations.
14     Q.   Okay.
15         So with management inquiries, if
16 an officer is being investigated, would that
17 officer be presented with any type of allegations?
18     A.   No.
19     Q.   Okay.
20         And what is the reason for that?
21     A.   Because we don't know if misconduct has
22 occurred or not.
23         I can't speak for the other divisions of
24 the Sheriff's Office, but I will speak for the

Page 40

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 15 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  Police Department.
2      When it comes to citizen complaints and
3  management inquiries, 90 percent of the time
4  we will get just a to/from memorandum from the
5  so-called accused.
6      For instance, a citizen calls in saying
7  I observed Unit 1300 driving erratically on the
8  expressway.
9      At that point, because a citizen called
10 in, we'll contact the commander, we'll say a
11 citizen called in, we need to get a memorandum
12 explaining the actions of the officer.
13     The officer will generate a memorandum.
14 Ninety percent of the time, that will suffice. We
15 won't even interview them. Because, again, we
16 have on paper exactly what occurred.
17     So we received a call, we looked into it
18 in the sense that we're getting a memorandum. And
19 then we can call the complainant back explaining
20 we did talk to the officer, they were going to a
21 call, or, you know, something spilled. I'm just
22 giving scenarios.
23     Or if the officer has an issue with it
24 pertaining to direct misconduct, then we will

Page 41

1  Q. Sure.
2  A. I mean, are we -- yeah.
3      MS. FLEMING: Mark this as Stajura 1 --
4  oh, I'm sorry, just a sec.
5          (Stajura Deposition Exhibit No. 1
6          marked for identification.)
7  BY MS. FLEMING:
8  Q. Just read through the document and let me
9  know when you're finished.
10 A. Okay. In this context -- this is my
11 interpretation of looking at this memo -- we had
12 a situation that occurred. Based on what was
13 being presented to the sergeant and the
14 lieutenant, it didn't make sense. So the
15 lieutenant was conducting a further investigation.
16     I do not take this, reading, again, this
17 memorandum, that this was any type of disciplinary
18 investigation.
19 Q. Okay. Thanks.
20     MS. FLEMING: This is 2.
21          (Stajura Deposition Exhibit No. 2
22          marked for identification.)
23 BY MS. FLEMING:
24 Q. Look through Stajura 2 and then let me

Page 43

1  step in, and we will move it along with a further
2  investigation.
3  Q. Okay.
4      And what about a scenario where the
5  complainant is within the department?
6  A. That happens quite frequently. We have it
7  where, again, as I just touched on, we'll receive
8  phone calls. A lot of times it is just to/from
9  memorandums.
10     So, depending on the allegations, we have
11 that happen quite frequently, where initially a
12 complaint will come in by, let's say memorandum,
13 by a commander. We start looking into it. We
14 identify that it's pretty serious.
15     At that point one of two things will
16 happen: Either somebody from my unit will
17 generate the complaint register or the individual
18 who initially filed the complaint will be asked to
19 generate a complaint register.
20 Q. Okay.
21     What is a preliminary supervisor
22 investigation?
23 A. Could you give me a little bit more
24 context on it?

Page 42

1  know when you're finished.
2  A. Okay.
3  Q. All right.
4      So have you seen this document before?
5  A. Yes.
6  Q. Okay.
7      And what is this?
8  A. This is the official complaint register.
9      So following the Uniform Peace Officer
10 Act, following a complaint, the individual has to
11 fill this out.
12     So this is a formal complaint being made
13 against an individual.
14 Q. And who was the complainant that's named
15 in this document?
16 A. On this one it is Deputy Inspector
17 Mike Goldsmith.
18 Q. And who is the accused?
19 A. The accused is Police Recruit
20 Brad Sandefur.
21 Q. And did you become involved in
22 the investigation into this incident involving
23 Police Recruit Sandefur?
24 A. I didn't in the sense of I was initially

Page 44

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 16 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  notified by one of my bosses, which was
2  Executive Officer Brian White, the same day of
3  this occurrence, which was July 6th. It was
4  later in the afternoon.
5       My understanding this event occurred
6  very early in the morning, like 6:00 in the
7  morning; I got notified about 3:30 in the
8  afternoon.
9       I was advised by Executive Officer White
10 that there was a situation that had occurred at
11 the training academy earlier in the day. He had
12 received a phone call from Lieutenant Camer, and
13 it was pertaining to the actions of a recruit and
14 a handicapped placard.
15 Q.   And what is Brian White's title?
16 A.   Currently he is the First Deputy Chief of
17 Police. At the time he was Executive Officer.
18 Q.   And what are the duties and
19 responsibilities as an Executive Officer?
20 A.   I --
21 Q.   If you know?
22 A.   Yeah, I couldn't answer that. They have
23 multiple duties.
24 Q.   Okay.

Page 45

1       There -- I was given the authority by
2  the Chief's Office to look into this. There was
3  no formal number put on it. I was given clear
4  instructions to look into this.
5       Based on those instructions, I contacted
6  the Legal Department due to the unique situation.
7  And I had asked my staff, consisting of Deputy
8  Inspector Goldsmith and Sergeant Sullivan, to
9  start looking into some of the aspects further.
10 Q.   And when did you contact the Legal
11 Department?
12 A.   The same day, the 6th.
13 Q.   And who did you contact?
14 A.   I attempted to reach out for a lady by
15 the name of Erica Conrad. She was in our
16 Legal Department at that point. I could not
17 reach her, and she was unavailable.
18 Q.   And why were you contacting Ms. Conrad?
19 A.   Again, because this was literally -- what
20 was conveyed to me by the Chief's Office, this
21 event occurred within the first hour of the
22 first day of the police academy.
23      Because it involved the police recruit,
24 they wanted our Legal Department to know about it

Page 47

1  investigation?
2  And were you assigned to this
3  A.   Yes.
4  Q.   Okay.
5       And who assigned you?
6  A.   Executive Officer Brian White.
7  Q.   Did Mr. White assign you on July 6, 2015,
8  to this investigation?
9  A.   Yes.
10 Q.   Okay.
11      And what was your assignment?
12 A.   Because of the conflicting information
13 that was coming in from the Cook County Sheriff's
14 Training Academy, specifically pertaining to
15 the statements provided by Police Recruit Sandefur
16 to initially Investigator Lane, then to the
17 sergeant, the lieutenant, then the memorandum that
18 was generated by Recruit Sandefur that were
19 conflicting and contradictory, I was asked to look
20 into this matter further.
21 Q.   As of July 6, 2015, was this considered a
22 management inquiry?
23 A.   It was not. This was I'll use the
24 terminology special investigation.

Page 46

1  immediately.
2  Q.   And was that Brian White who wanted the
3  Legal Department to be notified immediately?
4  A.   Yes.
5       So in addition to me running it down or
6  looking into it, we wanted the Legal Department
7  also notified also.
8  Q.   And you mentioned that I believe
9  Sergeant Sullivan, you had him look into the
10 matter further; is that correct?
11 A.   I actually had Goldsmith initially
12 looking into it, because he was higher ranking at
13 the point than Sergeant Sullivan.
14      But knowing that Deputy Inspector
15 Goldsmith would be leaving the unit, I didn't
16 know how long this matter was going to take. So
17 I actually had both of them looking into it or
18 working on it.
19 Q.   Okay.
20      And what action or conduct did
21 Goldsmith take in looking into the incident
22 further?
23      MR. HENRETTY:  Object to foundation.
24      Go ahead and answer, if you can.

Page 48

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 17 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

Page 49

1    THE WITNESS:  Okay.
2    A.   What Deputy Inspector Goldsmith did is
3  he had obtained a copy of a medical release form
4  that was generated by Police Recruit Sandefur,
5  apparently requested by the Training Academy.  He
6  requested medical documentation.
7    He also contacted the Illinois Secretary
8  of State, who's responsible for issuing the
9  handicapped placard.
10    He also was instructed to obtain
11  the memorandums that were apparently generated by
12  Sergeant Commack and Lieutenant Camer, as well
13  as interview, or attempt to interview,
14  Investigator Jeff Lange, who was initially
15  responsible for the entire event occurring or
16  he was the catalyst for it starting.
17    Q.   And you can look back at Stajura No. 1.
18  Is this the memorandum that Lieutenant Camer
19  generated regarding the incident?
20    A.   Yes, because his name is on there.
21    This one does not have his signature, so
22  he should have signed one.  I don't know if you
23  have that.
24    But I would say based on him having his

Page 50

1  name listed as, you know, Lieutenant Camer to
2  the Executive Office, that would be safe to say,
3  I guess.
4    Q.   Okay.
5    And if you can look about ten lines
6  from the bottom, it states "Reporting Lieutenant
7  spoke with Chief Nancy Bourque," B-o-u-r-q-u-e,
8  "with the Human Resource Division, who explained
9  that if Police Recruit Brad Sandefur was not
10  asking for any special treatment or consideration,
11  and was medically cleared, that there would not
12  be an employment issue at this time."
13    A.   Okay.
14    Q.   What is Chief Nancy Bourque's role in
15  the Human Resources Division?
16    A.   First off, she's no longer employed by
17  the Department.  But at the time she was
18  responsible for the oversight of the
19  Human Resources Division.
20    It's my position, based on this
21  memorandum, that this was -- he contacted
22  Nancy Bourque to clarify the handicap placard,
23  the medical issues.
24    Q.   And with respect to Sergeant Sullivan,

Page 51

1  what action did he take in looking into this
2  matter?
3    A.   At a point the matter was turned over to
4  Sergeant Sullivan for further investigation.
5    As Deputy Inspector Mike Goldsmith
6  progressed with his preliminary investigation
7  looking into the conduct issues, the
8  misrepresentation, he, Mike Goldsmith, generated
9  the complaint register.  So he was the complainant
10  on that.
11    I did not want it to be a conflict.  So
12  because Mike was the complainant, I did not want
13  him then to investigate it any further.
14    So at that point Mike generated the
15  complaint register, it went into the Office of
16  Professional Review formally, and John Sullivan
17  was tasked with the investigation.
18    Now, Mike Goldsmith did, in fact, assist
19  further, but John was the assigned investigator.
20    (Stajura Deposition Exhibit No. 3
21    marked for identification.)
22  BY MS. FLEMING:
23    Q.   And have you seen this document before?
24    A.   Yes.

Page 52

1    Q.   And what is this document?
2    A.   This is the notification from the Office
3  of Professional Review that a formal investigation
4  has been approved or would be assigned to my unit.
5    Q.   And when you say a formal investigation
6  has been approved, are management inquiries
7  considered formal investigations?
8    A.   No.  As I stated prior, it's an inquiry.
9    A formal investigation would be viewed as
10  a Department Head investigation.
11    So looking at this document, you'll see
12  where it references MI; that stands for Management
13  Inquiry.  So it's an inquiry, not a DH, which
14  is Department Head, which is the formal
15  investigation.
16    Q.   Okay.
17    And this document, it states that "If
18  the incident involved misconduct, you can
19  recommend that this be handled as a summary
20  discipline issue or investigated by OPR."
21    A.   Yes.
22    Q.   What is a summary discipline issue?
23    A.   As I stated prior, various forms of
24  investigations.  For the police department,

Deputy Chief Theodore John Stajura — 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 18 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  we have what is called ROSDA.  It's a Report of
2  Summary Discipline Action.  In the courts of
3  correction they call it SPAR or they call it
4  summary discipline.
5      Q.  Okay.
6      A.  So summary discipline is immediate
7  discipline that can be handled on a one-form
8  document, a ROSDA form, a SPAR form.
9      So the supervisor would identify
10  the infraction, list the infraction on there,
11  would make a recommendation for, let's say, a
12  written reprimand.
13      At that point the accused would be
14  sat down, they would explain what the infraction
15  is.  In some cases they would ask them for a
16  to/from memorandum explaining their objections or
17  it could be verbally what had occurred.  At that
18  point they ask the accused to sign it.
19      The generating supervisor, which is
20  traditionally a sergeant, would then generate
21  initially.  It then has a review process where
22  it has to be higher an a sergeant.  It is then
23  reviewed.
24      At that point the higher-ranking member
Page 53

1  could concur with the recommendation or can
2  reject it and say we're either going to give more
3  or less.
4      So when they're referencing summary
5  discipline in here, that's exactly what they're
6  talking about.
7      Q.  Okay.
8      You mentioned earlier that Mr. Goldsmith
9  had obtained a copy of a medical release form
10  signed by Mr. Sandefur.  Do you recall that?
11      A.  Yes.
12      Q.  Okay.
13      (Discussion held off the
14      record.)
15  BY MS. FLEMING:
16      Q.  Do you know when Mr. Goldsmith had
17  obtained the medical release form signed by
18  Mr. Sandefur?
19      A.  He received it.  It had to be the same day
20  as the 6th.  I base that statement on he sent out
21  the request to the medical facility that same day
22  as the incident, which was the 6th.
23      Q.  Okay.
24      And why was the request for
Page 54

1  medical documents made if Chief Bourque stated
2  that if Sandefur was not asking for any
3  special treatment or consideration and was
4  medically cleared, there wasn't an employment
5  issue?
6      MR. HENRETTY:  Objection to foundation,
7  form.
8      Answer if you can.
9      THE WITNESS:  Okay.
10      A.  The problem with Chief Bourque's statement
11  there is she was looking at it clearly as a
12  medical issue.
13      At this point we had clearly a
14  conduct issue.  We had false reporting on behalf
15  of Recruit Sandefur.  He provided false verbal or
16  oral information to Investigator Lange.  He was
17  then asked about it by Sergeant Cammack and
18  Lieutenant Camer, he then provided false
19  information to them.
20      He was then asked to write a memorandum.
21  The memorandum was, again, conflicting.  So at
22  that point that -- that's when we had the problem.
23      So it was medical related in the
24  sense that the underlying issue was the placard.
Page 55

1  But, based on his actions, it was becoming a
2  conduct issue.
3  BY MS. FLEMING:
4      Q.  Okay.
5      And once the incident is now considered
6  a management inquiry, so we're talking --
7      A.  July 27th?
8      Q.  Right, July 27th.
9      Generally speaking, back in 2015, how are
10  management inquiries investigated?
11      What steps are taken to either, you know,
12  substantiate the allegations or -- if that makes
13  sense.
14      A.  Well, it does make sense.  But, to
15  clarify, each investigation is unique in nature.
16  And the type of investigation and the process is
17  unique in nature.
18      So two investigations could not be
19  the same.  There's the possibility of a different
20  request.
21      If you're asking about this specific case,
22  then I can clarify further.
23      Q.  Okay.  Actually, let's see if I have
24  copies.
Page 56

**Deputy Chief Theodore John Stajura - 6/28/2018**
**Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.**

1  The complaint register that was filed by
2  Deputy Inspector Goldsmith, it's Stajura No. 2,
3  in the narrative portion it doesn't specify
4  inconsistent statements or false statements made
5  by Police Recruit Sandefur, does it?
6  **A.  Yeah, it does.  I mean, specifically,**
7  **I mean, if we're talking here, we're talking about**
8  **followups here.  We're talking about how he was**
9  **asked by Investigator Lange about the placard.**
10  **He initially states that it was his**
11  **wife's.  Investigator Lange apologized because of**
12  **his wife's problem or issue.  And then he goes on**
13  **to state to him that I also use it or, you know,**
14  **it's my placard too.  So right there it means a**
15  **false statement.**
16  Q.  I guess what I'm trying to understand is
17  at the point that the complaint register is made,
18  is Mr. Sandefur being accused of wrongfully
19  obtaining the handicap placard or is he being
20  accused of wrongfully obtaining the handicap
21  placard and false statements?
22  **A.  Both.**
23  Q.  Okay.
24  **A.  So, you know, again, it was the various**

Page 57

1  **A.  There was a phone interview conducted**
2  **with a gentleman by the name of Bogdan from the**
3  **Illinois Secretary of State.  He oversees the**
4  **handicap placard division, and Mr. Sandefur was**
5  **interviewed, again, because detailed complaints**
6  **were issued.  We did not interview the lieutenant**
7  **or the sergeant.**
8  **Deputy Inspector Goldsmith did, in fact,**
9  **interview and also obtained a memorandum from**
10  **Investigator Jeff Lange, who, again, was the**
11  **individual that initially discovered the placard**
12  **hanging from the mirror.**
13  Q.  And the memorandums that were generated by
14  Lieutenant Camer, actually, I believe it was one
15  memorandum, that was generated on July 26, 2017.
16  Does that have any bearing on the
17  overall investigation if it didn't turn into
18  a management inquiry until July, the end of July?
19  **A.  Could you repeat that?  Because the date**
20  **was the 17th -- or 2017 so.**
21  Q.  Sure.
22  So as of July 6th -- sorry, you're
23  correct -- July 6, 2015, the incident is being --
24  it's just being investigated; correct?

Page 59

1  inconsistent statements that he made orally and
2  then in writing to the various members of the
3  Command staff.
4  And then we had looked into the aspect of
5  him requesting and receiving approval for the
6  handicapped placard from the Secretary of State.
7  Q.  Okay.
8  **A.  Then we looked into that further under the**
9  **investigation.**
10  Q.  Okay.  Thanks.
11  **A.  Yes.**
12  Q.  So when investigating claims of
13  inconsistent statements or false statements
14  back in 2015, how were those investigations
15  conducted?
16  **A.  Well, we would conduct our investigations**
17  **by obtaining memorandums or interviewing people.**
18  **If there was support of documentation, we would**
19  **obtain that.  And the last thing we would do is we**
20  **would interview the individual that would be**
21  **considered the accused.**
22  Q.  Okay.
23  And do you know who was interviewed with
24  respect to this management inquiry?

Page 58

1  **A.  Uh-huh.  Yes.**
2  Q.  All right.
3  And that is when Lieutenant Camer
4  generated his memorandum; correct?
5  **A.  To clarify, you had, as you asked me**
6  **prior, you had Lieutenant Cammack -- or Camer**
7  **looking into the aspect with Nancy Bourque,**
8  **which we addressed.**
9  **But we also at that point, I was**
10  **assigned by Executive Office White to look into**
11  **the inconsistencies of statements being made and**
12  **the handicapped placard.  So at that point we were**
13  **conducting an investigation on it.**
14  Q.  Is there any particular reason why
15  the matter wasn't forwarded to OPR and a
16  formal complaint register made if there was
17  inconsistent statements as of July 6th?
18  **A.  Well, at that point we didn't know exactly**
19  **what we had.**
20  **And, again, also to point out at that**
21  **point we -- meaning us that were conducting this**
22  **investigation -- did not have an opportunity**
23  **to discuss anything with Mr. Sandefur, which**
24  **we did interview him later under the formal**

Page 60

Deputy Chief Theodore John Stajura    -    6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  investigative process.
2      So, to answer your question, we did not
3  feel that we had enough information to request
4  a formal investigation.  And, you know, to err on
5  the side of caution, again, doing this job as
6  long as I have, I try not to have a complaint
7  register number generated on anybody if it's
8  a misunderstanding or if there's some explanation
9  of what had occurred here, because that number
10  stays with you your entire career.
11  Q.   Right.
12  A.   So for that reason, like I had stated
13  prior, I received my orders from Executive Officer
14  White to look into it.  We did immediately that
15  day.
16      The memorandums were generated, as
17  requested by the Lieutenant and the Sergeant.
18  The Lieutenant generated one to the Executive
19  Officer.
20      At that point, being instructed to
21  look into it further, Mike Goldsmith then
22  contacted the Medical Division, got the records,
23  and contacted the Secretary of State.  So we were
24  being diligent immediately running down what we
Page 61

1  could at that point.
2      When we received additional information
3  from the Secretary of State pertaining to the
4  application aspect, that's when we understood
5  that there was a little bit more to this, and
6  that's when this was generated.
7  Q.   At any point throughout the investigation,
8  either prior to the formal complaint register
9  being made to the conclusion of the formal
10  complaint register, was Mr. Sandefur's doctor ever
11  interviewed?
12  A.   No.
13  Q.   Okay.
14      Throughout the investigative process,
15  were any recruit witnesses identified or
16  interviewed?
17  A.   No, because of the fact that this
18  happened -- this was a one-on-one situation that
19  occurred, again, literally within the first hour
20  of the incident.
21      And this was an event that occurred
22  between Investigator Lange and Police Recruit
23  Sandefur.  Those were the only two individuals
24  that, our investigation showed, were there at
Page 62

1  that point.
2      Subsequently, after Investigator Lange
3  brought the information to the Sergeant and then
4  to the Lieutenant, then more people were involved
5  with it.
6      But initially it was Investigator Lange
7  and it was the recruit.
8  MS. FLEMING:  Okay.
9      (Stajura Deposition Exhibit No. 4
10      marked for identification.)
11  MR. HENRETTY:  Is this Exhibit 4?
12  MS. FLEMING:  Yes.
13  BY MS. FLEMING:
14  Q.   Review this document and let me know when
15  you're finished.
16  A.   Okay.
17  Q.   I'm going to direct your attention to
18  the bottom of the first page, which is labeled
19  SANDEFUR/DART4.  And that last paragraph --
20  I'm sorry, what is this document?
21  A.   This is an overview.  This is not the
22  investigative report that was generated by
23  Sergeant Sullivan.
24      This is a subsequent report that was
Page 63

1  asked for by the higher-ups within the
2  Sheriff's Office.  So it wasn't myself or the
3  First Deputy Chief's office, it was higher,
4  higher up.
5      This was an overview of his investigation.
6  Q.   Okay.
7      And have you seen this before?
8  A.   I have.
9  Q.   Okay.
10      And is this document part of the
11  investigative file?
12  A.   I don't believe it was.  I believe this
13  was separate to the investigative file.
14  Q.   And what's the date on this document?
15  A.   September 3rd of 2015.
16  Q.   Okay.
17      And now directing your attention to the
18  bottom, it states "Based on the severity of the
19  issue and the fact that Police Recruit Sandefur
20  was claiming to be handicapped, but also able to
21  fully function as an unrestricted police recruit,
22  Cook County Sheriff's Police Lieutenant Nathan
23  Camer authored a memorandum stating that he and
24  Sergeant Cannon interviewed Police Recruit
Page 64

**Deputy Chief Theodore John Stajura   -   6/28/2018**
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 21 of 43 PageID #:491
**Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.**

1 Sandefur pertaining to the handicap placard."
2   A.  Okay.
3   Q.  And, sorry, I should have done this
4 together.
5          (Stajura Deposition Exhibit No. 5
6          marked for identification.)
7 BY MS. FLEMING:
8   Q.  Have you seen Stajura Exhibit 5 before?
9   A.  Yes.
10   Q.  Okay.
11      And what is this document?
12   A.  This is a memorandum of investigation.
13 This is generated to document the interview of
14 Police Recruit Brad Sandefur.
15   Q.  Okay.
16      And if you can turn to the last page,
17 it's labeled SANDEFUR/DART28.  The last paragraph
18 states that you advised Recruit Sandefur that
19 he was not being interviewed because he was
20 claiming that he was handicapped.
21   A.  That's correct.
22   Q.  Okay.
23      So why is it that Sergeant Sullivan
24 in his September 3, 2015, report indicated based
Page 65

1 on the severity of the issue that Police Recruit
2 Sandefur was claiming to be handicapped, but also
3 able to fully function as an unrestricted police
4 office versus your statement to him in his
5 August 4th interview, what -- what was the heart
6 of the investigation?
7   MR. HENRETTY:  Let me object to the
8 compound nature of the question, and also to
9 foundation, because he didn't -- this witness
10 didn't author either of these documents.
11      Is the question what is the heart of --
12   MS. FLEMING:  Yes, yes, yes.
13   THE WITNESS:  Okay.
14   A.  Do you want to clarify the question now?
15 BY MS. FLEMING:
16   Q.  Yeah.
17      So what was the focus of the
18 investigation?
19   A.  Again, the focus of the investigation
20 was initially they won, the first hour into it,
21 was the untruthfulness of Brad Sandefur and him
22 displaying his handicap placard.
23      As it progressed on, it was clear that
24 not only was he providing false oral and written
Page 66

1 information to the various components that were
2 asking for it, he also, based on what we were
3 looking into, could have falsified his application
4 for the placard.
5   Q.  Okay.
6      So you were present when Mr. Sandefur was
7 interviewed; correct?
8   A.  Yes.
9   Q.  And that was on August 4, 2015?
10   A.  Yes.
11   Q.  Okay.
12      How many management inquiry investigations
13 have you handled?
14   A.  Maybe 50.
15   Q.  And how many of those have involved
16 allegations of false or inconsistent statements?
17   A.  If I can clarify, we've had quite a few
18 that initially would start off as management
19 inquiries.
20      It's not uncommon to take an initial
21 management inquiry, and then, as I touched on
22 earlier, as we start investigating it, we
23 identify that this is clearly above the inquiry
24 level.  At that point we will request an
Page 67

1 upgrade on the investigation.
2      So, to clarify, it does happen quite
3 frequently where the investigation will start off
4 as a management inquiry.  As we look into it
5 further, it's then bumped up to, or upgraded, to
6 a Department Head investigation.
7      So it does happen that management
8 inquiries for untruthfulness are there, but
9 they are bumped up to Department Head
10 investigations.
11   Q.  And approximately how many times have
12 false or inconsistent statement investigations
13 been bumped up to Department Head investigations?
14   A.  I -- I couldn't answer that question.
15   Q.  Okay.
16      Now, how was Mr. Sandefur made aware that
17 he would be interviewed on August 4, 2015?
18   A.  Okay.  We had contacted the
19 Training Academy where he was a signed.  We had
20 instructed his supervisors that he needed to
21 come down and speak to myself and my staff
22 pertaining to the inconsistencies that were
23 occurring with the memorandum and the statements
24 that he had made to Jeff Lange.  He came down to
Page 68

Deputy Chief Theodore John Stajura – 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 22 of 43 PageID #:491

**Page 69**

1  our headquarters; myself was there.
2      My role in the investigation, or in
3  that interview, was specifically we're not
4  looking at this through a medical aspect.  We
5  are not doctors, and we are not going to
6  attempt to say yes, you know, he should be
7  handicapped, no, he's not.  That was not the
8  nature of the investigation.
9      So I was in there to make sure that
10  my investigators did not go down that path with
11  the questioning.
12      The interview was very cordial.  When
13  Mr. Sandefur arrived, he was greeted by myself,
14  Mike Goldsmith, and John Sullivan.  We stood up,
15  we shook his hand.  We each identified ourselves
16  by name and by title.
17      And we explained to him clearly that
18  there were some inconsistencies that had been
19  presented to the Department at this point
20  involving the oral statements that he made to
21  Jeff Lange on the first day, the oral statements
22  he made to his supervisors the first day,
23  the memorandum that he generated at the request of
24  the lieutenant, and, based on that, we needed to

**Page 70**

1  clarify what was going on here.
2  Q.  And when the inspectional service section
3  interviews an accused officer, are those recorded?
4  A.  For management inquiries, no.
5  Q.  Okay.
6  A.  Because, again, it's following the
7  Illinois Police Officer -- the Peace Officer's
8  Bill of Rights Act.
9      So because it's a management inquiry,
10  if it was sustained, it would be traditionally
11  under three days.  We do not record because it's
12  not a formal investigation or interrogation.
13  Q.  Okay.
14      Approximately how long was Mr. Sandefur's
15  interview?
16  A.  I would say approximately 45 minutes.
17  Q.  And, just to be clear, because this
18  investigation was labeled an informal management
19  inquiry, Mr. Sandefur was not provided with his
20  administrative proceeding rights?
21  A.  Right.  This was not a formal invest-- or
22  this was not a formal Department Head
23  investigation.  He was not being interrogated,
24  and, therefore, he was not presented with his

**Page 71**

1  allegations.
2      He did not ask for union representation.
3  And, as you had referenced in the one document,
4  the reason why that was referenced pertaining to
5  the medical aspect was Mr. Sandefur during the
6  course of the interview had made a reference that
7  he believed the interview was based on him being
8  handicapped.  Those were his words.
9      I reassured him that that interview was
10  not being conducted because of any type of
11  medical condition he had, it was clearly for
12  the inconsistencies that we were looking into at
13  that point.
14  Q.  Are recruits permitted to have a
15  union representative present for an interview?
16  A.  Based on our current collective bargaining
17  agreement with the police officers, no.
18  Q.  Okay.
19      At the time in 2015?
20  A.  No.
21  Q.  Okay.
22  A.  If I can clarify?
23  Q.  Sure.
24  A.  If Mr. Sandefur, because, again,

**Page 72**

1  if he would have asked for an attorney or to
2  stop to consult with somebody, we would have
3  stopped immediately.
4  Q.  Okay.
5  A.  It was a very cordial interview.  We
6  explained who we were and why we were talking to
7  him.
8      We were not trying to, I guess, hurt them
9  or interrogate them in any way.
10  Q.  And do you recall what the outcome of
11  the investigation was?
12  A.  Could you clarify that?  Because --
13  Q.  Oh, sure.  The findings.
14  A.  Yeah, based on the findings, it was a
15  sustained investigation.
16  Q.  Okay.
17      And what was the penalty, if you recall?
18  A.  The penalty was Mr. Sandefur being
19  returned to the Department of Corrections.
20  Q.  Okay.
21      And does that amount to discipline?
22  A.  It's -- I mean, it's hard for me to answer
23  that question.
24      If I can clarify?

Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 23 of 43 PageID #:491
Deputy Chief Theodore John Stajura - 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

**Page 73**

1  Q.  Sure.
2  A.  If a management inquiry, as I
3  repeatedly stated in this deposition, the
4  maximum discipline that could have been imposed,
5  unless the investigation was bumped up or
6  taken over by OPR, would have been a three-day
7  suspension.
8  So Mr. Sandefur did not even receive
9  a three-day suspension.  He didn't receive a
10  written reprimand.
11  So the outcome was him being returned.  So
12  that's why I had asked for clarity.  Because,
13  based on what you're asking, he did not receive
14  any discipline.
15  Q.  Right.  And that's -- so removal from
16  the training academy was not considered discipline
17  in this management inquiry?
18  It's not discipline?
19  MR. HENRETTY:  Object to form and
20  foundation.
21  A.  Yeah, do you know what?  I can't answer
22  that question, I mean...
23  MS. FLEMING:  Okay.  I'm going to show
24  you...

**Page 74**

1  (Stajura Deposition Exhibit No. 6
2  marked for identification.)
3  BY MS. FLEMING:
4  Q.  And take a couple of minutes and review
5  this document.
6  A.  Okay.
7  Q.  And have you seen this document before?
8  A.  Yes.
9  Q.  And what is it?
10  A.  This is a notification memorandum to Then
11  Chief of Bureau of Human Resources Nancy Bourque.
12  Q.  And what is -- who does the notification
13  memorandum pertain to?
14  A.  It pertains to Police Recruit
15  Brad Sandefur.
16  Q.  And the subject line states "SEAM,"
17  S-E-A-M, "Article B, merit rank promotional
18  procedures."
19  What does SEAM stand -- oh, actually,
20  strike that.
21  What is "SEAM Article B?"
22  A.  "SEAM" is the Sheriff's Employment Action
23  Manual, that's what it stands for.
24  "Article B" is an article within

**Page 75**

1  the document that covers the merit promotions
2  and the valuations of candidates that are
3  on probation.
4  Q.  And why does the notification memorandum
5  refer to SEAM Article B?
6  A.  As stated in the second paragraph
7  of the document, per SEAM Article B, any
8  time there was any removal of an employee,
9  notification had to be made to various entities.
10  Two that come to mind were at the time
11  Chief Nancy Bourque, who was overseeing the
12  HR Division.  The other individual was a
13  Mr. Robert Egan, who was the Compliance Officer.
14  Q.  Okay.
15  So this notification memorandum was
16  generated, essentially, to be in compliance with
17  SEAM Article B?
18  A.  Yes.
19  Q.  Okay.
20  And in 2015, generally, investigations
21  involving false -- false and inconsistent
22  statements, would the accused officer be
23  made aware of the specific inconsistent
24  statements?

**Page 76**

1  A.  Could you clarify that a little bit?
2  Q.  Sure.
3  So if you're handling an investigation
4  that involves false statements, or inconsistent
5  statements, is the accused member informed as to
6  the specific statements that he is alleged to
7  have, you know, falsified?
8  MR. HENRETTY:  Object to foun- -- form.
9  But go ahead and answer.
10  A.  You know, it all pertains to the type of
11  investigation.
12  Serious investigations we would
13  basically show them their inconsistencies and
14  say look, you know, you stated this in a
15  memorandum, you're now saying this; you're
16  inconsistent.
17  In other cases, like with Department Head
18  investigations --
19  BY MS. FLEMING:
20  Q.  Right.
21  A.  -- we're just taking a statement.
22  And then after the statement is done,
23  we're not going to pick apart every time somebody
24  gives a false statement.

Deputy Chief Theodore John Stajura  –  6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

Page 77

1    But once we review the statement, and
2  then we conduct our investigation further, we
3  would look at the evidence, and then compare it
4  to the statement provided by the accused, and
5  compare.
6    Everybody makes mistakes.  But if there is
7  a general pattern of inconsistencies, then there's
8  an issue there.
9  Q.  Okay.
10    What is a Brady violation?
11  A.  A Brady violation is -- there's various,
12  I guess, components to it.  It pertains to,
13  in our realm, law enforcement, it pertains to
14  an individual that has been identified as
15  being untruthful either in court testimony,
16  in administrative statements, police reports,
17  grand jury testimony, official court or even
18  in to/from memorandums or various official
19  police documents or reports.
20  Q.  Okay.
21    And during your time spent in the
22  Inspectional Services section in the Office of...
23  A.  Discipline, Compliance and Inspections?
24  Q.  Yes.

Page 78

1  A.  DCI?
2  Q.  Yes.
3    Have you ever investigated alleged
4  Brady violations?
5  A.  No.
6  Q.  Okay.
7  A.  We have, to clarify, we've had
8  underlying allegations both on, as you had
9  asked prior, on management inquiries where there
10  might be an additional allegation.
11    But, as we look into it further, we
12  then determine that there's been some
13  untruthfulness, or on Department Head
14  investigations where allegations are being made,
15  and, through the course of the allegations, we
16  can clearly show that there's been some
17  untruthfulness, either in statements made,
18  reviewing body-worn camera footage, police
19  reports.
20    So there's various things that we'll
21  look into to compare the statements being made.
22  Q.  Would it be fair to say that the
23  Office of Professional Review generally handles
24  investigations regarding alleged Brady violations?

Page 79

1    MR. HENRETTY:  Object to form, foundation.
2  A.  That -- again, attempting to clarify that,
3  I -- I don't think I'd be able to answer that.
4  BY MS. FLEMING:
5  Q.  Okay.
6  A.  And the reason why I say that is because,
7  as I repeatedly stated here, it all depends on
8  the specific investigation, what the initial
9  allegations are.
10    To basically say that an initial
11  investigation is a Brady violation, there would
12  have to be, again, some foundation, okay, how is
13  this a Brady violation?
14    Did a Judge bring it to the Department's
15  attention that this individual lied to the Court
16  or to a grand jury?  There has to be some other
17  basis for it, not just a Brady violation.
18    So have we conducted investigations that
19  have led to untruthfulness?  Absolutely.  It does
20  happen.
21    But to receive an investigation just
22  based on Brady, no, I don't ever recall ever
23  seeing an investigation like that.
24  Q.  Right.

Page 80

1    So I guess, for example, if a
2  department member -- if a Judge came and made an
3  allegation that the department member perjured
4  himself, would that be considered -- that would be
5  something that would be investigated by either
6  you guys or the Office of Professional Review?
7  A.  Yes.
8  Q.  Okay.  Okay.
9    So with respect to the sustained findings
10  with Mr. Sandefur's management inquiry, does the
11  investigation amount to a Brady violation?
12    MR. HENRETTY:  Object to foundation, form.
13    Go ahead.
14  A.  Based on the totality, yes.
15  BY MS. FLEMING:
16  Q.  And do you know if Mr. Sandefur
17  was ever notified in writing that he had been
18  accused and found to have committed a
19  Brady violation?
20  A.  I -- I would have no knowledge of that.
21  Q.  Okay.
22  A.  Not even pertaining to our investigation,
23  because the process is is that once my
24  investigator completes it, they make a

Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 25 of 43 PageID #:491

Deputy Chief Theodore John Stajura – 6/28/2018
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1 recommendation.
2      I then will put a cover memo on it to
3 my First Deputy Chief, at the time I believe this
4 was going on, it was Dana Wright.
5      Again, I'm only making a recommendation.
6 I'm not sending someone to the Merit Board for
7 termination or give a written reprimand.  So I
8 only make a recommendation.
9      And then in this scenario with
10 Chief Wright signing off on the document,
11 that's only acknowledging that the investigation
12 had been completed.
13      Even in her capacity as First Deputy,
14 I don't believe she was in a position to make
15 that determination that, you know, he was a
16 Brady violation.
17      So hopefully I answered the question.
18 After the investigation is done, I don't know
19 what happens.
20      Q.   Right.  It's out of your hands?
21      A.   Yes.
22           MS. FLEMING:  Okay.
23                (Stajura Deposition Exhibit No. 7
24                marked for identification.)

Page 81

1 lists October 14, 2015, why a year later
2 the management inquiry would be classified as
3 a Brady violation?
4           MR. HENRETTY:  Object to foundation.
5      A.   Yeah, I -- I couldn't answer that,
6 because, again, as I stated prior, once our
7 investigation is turned back in to the
8 Office of Professional Review, we have no further
9 action.  Unless discipline is being imposed, then
10 we have to send out notifications.
11      But with this, as you touched on,
12 with it being almost a year later, I have
13 no knowledge of that.
14 BY MS. FLEMING:
15      Q.   Okay.
16      And then you mentioned earlier that you
17 had reviewed the investigative file.
18      A.   Yes.
19      Q.   Okay.
20      What documents make up the investigative
21 file with respect to Mr. Sandefur?
22      A.   Okay.  What we were looking at is
23 we were looking at the handicap placard
24 application, there was various memorandums

Page 83

1 BY MS. FLEMING:
2      Q.   So let me show you.  This is 7.  And,
3 if you can turn -- well, first, do you know what
4 this document is?
5      A.   I've seen it before, yes.  This is an
6 Office of Professional Review, like a discipline
7 summary.
8      Q.   Okay.
9      And if you could turn to the second page
10 where it's labeled "Management Inquiry."
11      A.   Yes.
12      Q.   Okay.
13      Now, it lists "October 14, 2015,
14 reassignment, sustained, no discipline,
15 reassigned."
16      A.   Uh-huh.
17      Q.   And then it indicates underneath
18 "August 24, 2016, Brady violation."
19      Do you know who came to the conclusion
20 that this incident amounted to a Brady violation?
21      A.   No, I don't.
22      Q.   Okay.
23      Do you know why it would -- you know,
24 if the investigation concluded, and it

Page 82

1 that were generated by Mr. Sandefur, by the
2 Lieutenant.  There was memorandums investigations
3 that were generated by Mike Goldsmith documenting
4 the interview of Jeff Lange.
5      There was medical documents placed into
6 the investigative file; however, they weren't
7 utilized.  They were there because they were
8 obtained.  And the memorandum pertaining to
9 the interview of Brad Sandefur was also included
10 in there.
11      A summary is then generated by
12 the Investigating Officer, which was
13 Sergeant Sullivan, and then a cover memorandum
14 is generated by myself that goes to my boss,
15 again, as I referenced at the time was
16 First Deputy Chief Dana Wright.  Again, it's
17 saying that the investigate was completed, and
18 there was recommendations on there.
19      Q.   Okay.
20      And when you say that the
21 medical documents weren't utilized, what did you
22 mean by that?
23      A.   Again, as I said repeatedly, as I
24 also mentioned to Mr. Sandefur, that we were

Page 84

Deputy Chief Theodore John Stajura — 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 26 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

1  not looking into his medical issues.
2       He referenced in his application that
3  he had a knee issue; that's what he initially
4  told Jeff Lange. He then said it was his wife.
5       When we interviewed him, his story
6  changed completely. He referenced that he had
7  knee problems, but then he also told us that
8  he had a back issue.
9       When we questioned him saying, well,
10  if you received the application or the approval
11  for the placard based on a knee injury, but
12  you're now telling us that it was a back issue,
13  did you notify the Secretary of State, he advised
14  that he did not.
15       It was pointed out to him again that
16  you renewed this placard. So, again, did
17  you ever bring it to the doctor's attention
18  that possibly it was filled out properly --
19  improperly or that you had requested this
20  placard under false pretenses?
21       And again he said that he was aware of
22  it, but he did not make notification to the
23  Secretary of State to have any changes made.
24    Q. Where are the investigations that your

Page 85

1  unit conducts?
2    A. They're turned over to the Office of
3  Professional Review.
4       So that investigation, when it was
5  completed, it's turned over to the Office of
6  Professional Review.
7    Q. Okay.
8       And then the Office of Professional Review
9  then has access to the file; correct?
10    A. Yes.
11    Q. Okay.
12    MS. FLEMING: I don't think I have
13  anything else. I just want to make sure.
14       I don't have anything further.
15          EXAMINATION
16  BY MR. HENRETTY:
17    Q. Just a couple of quick questions for
18  you.
19       Can you pull out Exhibit 6. That's the
20  September 17th memo. Do you see that one?
21    A. Yes.
22    Q. If you look at the second paragraph,
23  it reads "In the Sheriff's Employment Action
24  Manual" --

Page 86

1  Which is SEAM I think you said?
2    A. Yes.
3    Q. -- Article B: Merit Rank Promotional
4  Procedures. IX. Evaluation of promotional
5  candidates. L Probationary Period 3(a) and (b),
6  it states:
7       "In the event that the immediate
8  supervisor and the Department Head/designee agree
9  that the selected candidate has failed to meet the
10  requirements of the position, the Department Head/
11  designee will notify the Bureau Chief of Human
12  Resources via written memorandum to request his or
13  her return to the previous merit rank."
14       Did I read that correctly?
15    A. Yes.
16    Q. And this is, in fact, your memorandum
17  that you wrote to notify the Bureau Chief of
18  Human Resources regarding this issue; correct?
19    A. Yes.
20       And if I can clarify?
21    Q. Yeah.
22    A. Again, based on the timeline, if you will,
23  at this point, September 17th, Mr. Sandefur had
24  already been sent back to the Department of

Page 87

1  Corrections.
2       So, again, this was a few days later.
3  This memorandum was just to comply with the
4  SEAM process.
5    Q. And by this point your office had
6  determined that Mr. Sandefur made false and
7  inconsistent statements; is that accurate?
8    A. Yes.
9    Q. And based on the fact that you sent
10  this, is it fair to say that those false and
11  inconsistent statements were sufficient to
12  establish that Sandefur failed to meet
13  the requirements for the position of
14  Police Recruit?
15    A. Yes.
16    Q. Okay. Just a clarification, and I think
17  that's all I have.
18       When you were speaking with counsel
19  briefly, or being asked questions, about
20  whether or not you investigate Brady violations --
21       Do you remember that?
22    A. Yes.
23    Q. -- it's my understanding that whether or
24  not something is a Brady violation is ultimately

Page 88

Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 27 of 43 PageID #:491
**Deputy Chief Theodore John Stajura  -  6/28/2018**
**Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.**

1 determined after your investigation; is that fair
2 to say?
3    A.  Yes.
4    Q.  So when you say you don't investigate
5 Brady violations, you actually mean people don't
6 come to you and say is this a Brady violation?
7    A.  Right.
8       It's usually what we'll find out, as
9 I touched on earlier, is through the course of
10 an investigation, we will determine, like in
11 this matter, we were looking at the issue of
12 the inconsistency, and then it turned out that
13 it was multiple inconsistencies.  It's the same
14 thing.
15    Q.  So you do conduct investigations that
16 turn out to establish or show Brady violations?
17    A.  Yes, but we don't conduct
18 Brady investigations.
19    MR. HENRETTY:  Thanks.  All right.
20 Nothing further from me.
21       FURTHER EXAMINATION
22 BY MS. FLEMING:
23    Q.  I just have a few followups.
24       If you know, what effect does a

Page 89

1    You have the right, if it gets ordered,
2 to review the transcript and sign off on it
3 before it gets sent around to everybody else.
4    What that means is you can make sure
5 that she took it down correctly, not that you
6 can change your answers.  It's saying that -- you
7 know, to make sure everything is spelled right and
8 that she took it down properly or you can waive
9 that if you believe she took it down correctly.  I
10 have no problem with you if you decide if you want
11 to waive it.
12    THE WITNESS:  Okay.  Yeah, I'll waive it.
13    THE COURT REPORTER:  Are you ordering the
14 original, Attorney Fleming?
15    MS. FLEMING:  No.
16    But can I get your information?
17    THE COURT REPORTER:  Do you want to order
18 the original?
19    MR. HENRETTY:  Not right now.  But if she
20 does, I'll take one.
21       (Whereupon proceedings were
22        adjourned at 12:30 PM.)
23
24

Page 91

1 Brady violation have on a Cook County
2 Sheriff's Office department member?
3    A.  It's hard to say.  I mean, I can, again,
4 attempt to answer your question.
5       I can relate to maybe a police officer,
6 because, again, everybody's different.
7       I know, like, for instance, if a
8 police officer gets identified as a
9 Brady violation, they will then have problems
10 with the Cook County State's Attorney's Office,
11 because they're viewed as a noncredible witness.
12 So when it comes time for testimony, they would
13 have problems there.
14       So, again, that's one way I hopefully
15 answered your question there.
16    Q.  Right.
17       So in terms of SEAM Article B,
18 merit rank promotional procedures -- sorry.  Let
19 me get there.
20    MS. FLEMING:  Do you know what?  I don't
21 have anything further.
22    MR. HENRETTY:  I'll explain it to you.  So
23 the court reporter has been taking down everything
24 we've been saying.

Page 90

1    STATE OF ILLINOIS  )

2                       )    SS:

3    COUNTY OF C O O K  )

4        I, Deralyn Gordon, a notary public within and

5    for the County of Cook and State of Illinois, do

6    hereby certify that heretofore, to-wit, on the

7    28th of June, 2018, personally appeared before me

8    at 206 South Jefferson Street, Suite 100, Chicago,

9    Illinois, DEPUTY CHIEF THEODORE JOHN STAJURA,

10   in a cause now pending and undetermined in the

11   United States District Court for the Northern

12   District of Illinois, wherein Brad Sandefur is

13   the Plaintiff, and Sheriff of Cook County

14   Thomas J. Dart, et al., are the Defendants.

15       I further certify that the said witness

16   was first duly sworn to testify the truth, the

17   whole truth and nothing but the truth in the

18   cause aforesaid; that the testimony then given

19   by said witness was reported stenographically

20   by me in the presence of the said witness,

21   and afterwards reduced to typewriting by

22   Computer-Aided Transcription, and the foregoing is

23   a true and correct transcript of the testimony so

24   given by said witness as aforesaid.

1       I further certify that the signature to the

2   foregoing deposition was waived by counsel for the

3   respective parties.

4       I further certify that the taking of this

5   deposition was pursuant to Notice, and that there

6   were present at the deposition the attorneys

7   hereinbefore mentioned.

8       I further certify that I am not counsel for

9   nor in any way related to the parties to this

10   suit, nor am I in any way interested in the

11   outcome thereof.

12       IN TESTIMONY WHEREOF:  I have hereunto set

13   my hand and affixed my notarial seal this 4th day

14   of December, 2018.

15

16

17

18

19   /s/ Deralyn Gordon

20             Notary Public, Cook County, Illinois

21

22

23

24

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 30 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

## WORD INDEX

**< 0 >**
**084-003957** 1:*24*

**< 1 >**
**1** 3:*18* 43:*3, 5*
49:*17*
**10:35** 1:*19*
**100** 1:*17* 2:*6*
23:*13* 92:*8*
**12:30** 91:*22*
**13** 4:*8*
**1300** 41:*7*
**13th** 2:*14*
**14** 82:*13* 83:*1*
**15** 3:*23* 4:*6, 8, 10*
**17** 4:*10*
**17-CV-2048** 1:*6*
**17th** 59:*20* 86:*20*
87:*23*
**1985** 8:*19*
**1990** 9:*4*
**1992** 11:*1, 17*
**1994** 14:*5*
**1996** 16:*18*

**< 2 >**
**2** 3:*20* 43:*20, 21, 24*
57:*2*
**2000** 23:*9, 10*
**2002** 10:*9*
**2003** 10:*6*
**2004** 23:*19* 24:*1*
**2005** 25:*6*
**2006** 25:*7, 9*
**2007** 10:*14*
**2008** 10:*14*
**2011** 28:*18*
**2012** 28:*18, 19, 21*
35:*24*
**2014** 14:*4*
**2015** 33:*2, 4* 36:*22,*
*23, 24* 37:*7* 46:*7, 21*
56:*9* 58:*14* 59:*23*
64:*15* 65:*24* 67:*9*
68:*17* 71:*19* 75:*20*
82:*13* 83:*1*
**2016** 36:*2* 82:*18*
**2017** 59:*15, 20*

**2018** 1:*17* 3:*4*
92:*7* 93:*14*
**206** 1:*17* 2:*6* 92:*8*
**24** 28:*1* 82:*18*
**24-hour** 27:*20*
**25** 12:*12*
**250** 27:*12*
**26** 59:*15*
**27** 3:*23*
**27th** 56:*7, 8*
**28** 3:*4*
**28th** 1:*16* 92:*7*
**29** 38:*16*

**< 3 >**
**3** 3:*21* 4:*6* 51:*20*
65:*24* 87:*5*
**3:30** 45:*7*
**312** 2:*8, 16*
**3rd** 64:*15*

**< 4 >**
**4** 4:*6* 63:*9, 11*
67:*9* 68:*17*
**43** 3:*18, 20*
**45** 70:*16*
**4th** 66:*5* 93:*13*

**< 5 >**
**5** 3:*8* 4:*8* 65:*5, 8*
**50** 67:*14*
**51** 3:*21*

**< 6 >**
**6** 4:*10* 46:*7, 21*
59:*23* 74:*1* 86:*19*
**6:00** 45:*6*
**60** 28:*9*
**603-1426** 2:*16*
**60602** 2:*15*
**60661** 2:*7*
**63** 4:*6*
**65** 4:*8*
**655-7660** 2:*8*
**69** 2:*14*
**6th** 45:*3* 47:*12*
54:*20, 22* 59:*22*
60:*17*

**< 7 >**

**7** 3:*23* 4:*12* 81:*23*
82:*2*
**74** 4:*10*

**< 8 >**
**8** 4:*8*
**81** 4:*12*
**86** 3:*9*
**89** 3:*8*

**< 9 >**
**9** 4:*6, 10*
**90** 41:*3*
**94** 12:*5*
**98** 17:*11, 12*

**< A >**
**ability** 7:*13* 36:*1*
**able** 15:*18* 64:*20*
66:*3* 79:*3*
**above-entitled** 1:*14*
**Absolutely** 79:*19*
**Academy** 10:*8, 8*
11:*10* 13:*19* 14:*3,*
*9, 12* 21:*15* 45:*11*
46:*14* 47:*22* 49:*5*
68:*19* 73:*16*
**access** 86:*9*
**accident** 15:*10*
19:*9, 13* 30:*18*
32:*15*
**accidental** 31:*17*
32:*7*
**accidents** 26:*6*
30:*16* 32:*11*
**accurate** 88:*7*
**accurately** 7:*2, 14*
**accused** 41:*5* 44:*18,*
*19* 53:*13, 18* 57:*18,*
*20* 58:*21* 70:*3*
75:*22* 76:*5* 77:*4*
80:*18*
**acknowledging**
81:*11*
**Act** 37:*16* 38:*10*
44:*10* 70:*8*
**action** 48:*20* 51:*1*
53:*2* 74:*22* 83:*9*
86:*23*
**actions** 41:*12* 45:*13*

**56:*1*
**adage** 24:*22*
**added** 36:*16*
**addition** 38:*16* 48:*5*
**additional** 19:*11*
24:*19* 62:*2* 78:*10*
**addressed** 60:*8*
**adjourned** 91:*22*
**administration** 9:*2*
10:*3*
**administrative** 9:*8*
23:*4* 26:*9* 30:*1*
33:*7, 9* 34:*12*
70:*20* 77:*16*
**advised** 45:*9* 65:*18*
85:*13*
**Affairs** 3:*20* 21:*18*
**affixed** 35:*9* 93:*13*
**aforesaid** 92:*18, 24*
**afternoon** 45:*4, 8*
**agency** 28:*3* 38:*5,*
*23*
**ago** 12:*12*
**agree** 87:*8*
**agreement** 5:*9*
71:*17*
**ahead** 48:*24* 76:*9*
80:*13*
**al** 1:*8* 92:*14*
**allegation** 39:*14*
78:*10* 80:*3*
**allegations** 8:*11*
37:*12, 19* 38:*14*
40:*7, 17* 42:*10*
56:*12* 67:*16* 71:*1*
78:*8, 14, 15* 79:*9*
**alleged** 76:*6* 78:*3,*
*24*
**allowed** 23:*3*
**amount** 13:*17* 26:*2*
72:*21* 80:*11*
**amounted** 82:*20*
**annual** 15:*16*
**answer** 6:*24* 7:*8,*
*14* 45:*22* 48:*24*
55:*8* 61:*2* 68:*14*
72:*22* 73:*21* 76:*9*
79:*3* 83:*5* 90:*4*
**answered** 7:*1* 29:*7*
81:*17* 90:*15*

Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 31 of 43 PageID #:491

answers 91:6
anticipate 6:17
anybody 61:7
apart 7:18 13:1
76:23
apologize 36:4
apologized 57:11
apparently 49:5, 11
appeared 2:10, 18
92:7
applicable 5:9
application 62:4
67:3 83:24 85:2, 10
appointed 22:22
23:17 36:3
apprehension 24:13
28:13
approval 58:5
85:10
approved 52:4, 6
approximately 1:18
9:15 10:13, 24
11:9, 24 12:5 14:2,
8, 18 15:12, 14
16:15 17:7, 9 18:8,
14, 24 19:20 21:9,
10 23:6 24:15
26:14 28:18 36:24
68:11 70:14, 16
area 15:2, 13, 19
16:10, 11, 15 19:3
25:19, 19
areas 33:15
area-wide 26:1
armed 24:7
arrest 28:4
arrests 19:9
arrived 69:13
Article 74:17, 21, 24,
24 75:5, 7, 17 87:3
90:17
asked 6:10 26:16
28:22 29:3 35:23
36:4 42:18 46:19
47:7 55:17, 20
57:9 60:5 64:1
72:1 73:12 78:9
88:19
asking 50:10 55:2
56:21 67:2 73:13

aspect 34:5 58:4
60:7 62:4 69:4
71:5
aspects 47:9
assault 24:7
assign 34:7 39:24
46:7
assigned 14:13, 15
15:2, 13, 15 16:17
19:1, 2 21:5 25:11
27:15, 19 37:10
46:1, 5 51:19 52:4
60:10
assignment 11:2, 13
23:20 25:23 46:11
assignments 11:18
15:1 20:20 21:22
assist 33:18 34:17
51:18
assisted 34:19
assisting 15:9
associated 26:18
assume 7:1
attempt 49:13 69:6
90:4
attempted 47:14
attempting 79:2
attend 8:12, 14
9:24 21:14
attendance 30:10
attention 63:17
64:17 79:15 85:17
ATTORNEY 2:12
3:15 4:3 34:19
72:1 91:14
attorneys 93:6
Attorney's 90:10
audits 29:24 35:1
August 66:5 67:9
68:17 82:18
author 66:10
authored 64:23
authority 23:2 47:1
available 16:6
average 22:2
aware 68:16 75:23
85:21

< B >
back 16:1 23:23
25:4 29:15 34:1

35:23 36:6 41:19
49:17 56:9 58:14
83:7 85:8, 12 87:24
background 8:10
22:13
bargaining 71:16
base 54:20
based 9:13 16:5
29:11 32:21 43:12
47:5 49:24 50:20
56:1 64:18 65:24
67:2 69:24 71:7,
16 72:14 73:13
79:22 80:14 85:11
87:22 88:9
basically 16:9
26:11 76:13 79:10
basis 79:17
bearing 59:16
becoming 56:1
beginning 1:18
behalf 2:10, 18
55:14
believe 13:19 24:21
48:8 59:14 64:12,
12 81:3, 14 91:9
believed 71:7
best 7:2 36:1
bid 15:16, 18 16:10
bidded 15:19
bidding 15:20
bigger 9:12
Bill 70:8
bit 42:23 62:5 76:1
Board 12:15 17:18
81:6
body-worn 34:22
35:4 36:12 78:18
Bogdan 59:2
boss 23:19 25:1
84:14
bosses 45:1
bottom 20:9 50:6
63:18 64:18
Bourque 50:22
55:1 60:7 74:11
75:11
B-o-u-r-q-u-e 50:7
Bourque, 50:7
Bourque's 50:14
55:10

BRAD 1:4 44:20
50:9 65:14 66:21
74:15 84:9 92:12
Brady 77:10, 11
78:4, 24 79:11, 13,
17, 22 80:11, 19
81:16 82:18, 20
83:3 88:20, 24
89:5, 6, 16, 18 90:1,
9
break 7:5, 6, 9
Brian 45:2, 15 46:6
48:2
briefly 88:19
bring 35:10 79:14
85:17
brought 63:3
bumped 68:5, 9, 13
73:5
bunch 20:3
Burbank 8:15
Bureau 74:11
87:11, 17

< C >
cadet 11:6, 8
call 13:7 14:13
16:5 26:4 39:15
41:17, 19, 21 45:12
53:3, 3
called 5:12 9:12
33:13, 15 41:9, 11
53:1
calls 15:8 30:10
41:6 42:8
Camer 45:12 49:12,
18 50:1 55:18
59:14 60:3, 6 64:23
camera 35:4, 7
78:18
cameras 20:6
34:22 36:12
Cammack 55:17
60:6
candidate 87:9
candidates 75:2
87:5
Cannon 64:24
capacity 20:21
81:13

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 32 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

car 21:3
career 6:5 61:10
case 38:23 56:21
cases 6:2 35:11
53:15 76:17
catalyst 49:16
cause 1:15 92:10,
18
caution 61:5
certain 16:4
certified 13:4
certify 92:6, 15
93:1, 4, 8
change 91:6
changed 11:4
12:11 32:21 85:6
changes 85:23
chargeable 30:18,
19, 21 32:12, 12
checks 11:22
Chicago 1:18 2:7,
15 10:7 21:14
24:8 92:8
CHIEF 1:13 3:7,
14 4:2 5:4, 11, 16
29:4, 6 35:13, 20, 22
36:3 45:16 50:7,
14 55:1, 10 74:11
75:11 81:3, 10
84:16 87:11, 17
92:9
Chiefs 34:9
Chief's 21:20 22:17,
21 23:2 37:21
47:2, 20 64:3
child 20:4
citizen 11:22 19:13
21:24 22:3 26:7
39:14 41:2, 6, 9, 11
citizens 15:9 35:6
civilian 27:6
claiming 64:20
65:20 66:2
claims 58:12
clarification 88:16
clarify 50:22 56:15,
22 60:5 66:14
67:17 68:2 70:1
71:22 72:12, 24
76:1 78:7 79:2

87:20
clarity 73:12
class 11:11 18:6, 9
classified 83:2
clear 47:3 66:23
70:17
cleared 50:11 55:4
clearly 55:11, 13
67:23 69:17 71:11
78:16
clerks 27:6, 8
Close 28:9
closely 27:7 30:23
31:3 37:15
Closer 25:7
collective 71:16
college 8:21, 22
9:11
come 39:12, 14
42:12 68:21 75:10
89:6
comes 41:2 90:12
comfortable 21:2
coming 11:22 16:1
25:2 46:13
Commack 49:12
Command 13:11
18:15 19:16 21:21
22:15, 21 58:3
commander 35:13
41:10 42:13
commanders 22:19
Commanding 26:23
commercial 17:5
committed 80:18
company 9:12
compare 77:3, 5
78:21
complainant 41:19
42:5 44:14 51:9, 12
Complaint 3:21
42:12, 17, 18, 19
44:8, 10, 12 51:9, 15
57:1, 17 60:16
61:6 62:8, 10
complaints 19:14
21:24 22:3, 14
26:7 41:2 59:5
complete 14:23
completed 81:12

84:17 86:5
completely 85:6
completes 80:24
completing 13:13, 14
completion 14:11
compliance 30:7
33:1 34:3 75:13,
16 77:23
comply 88:3
components 67:1
77:12
compound 66:8
computer 31:20
Computer-Aided
92:22
concerns 22:16
concluded 82:24
conclusion 62:9
82:19
concur 54:1
condition 71:11
conduct 17:4 23:4,
12 31:4 33:7, 17, 23
35:2, 9 36:14, 19
48:20 51:7 55:14
56:2 58:16 77:2
89:15, 17
conducted 21:23
26:5 31:24 34:16
35:24 37:8, 9 39:1
40:10 58:15 59:1
71:10 79:18
conducting 15:9
22:18 29:24 30:1
37:18 39:5 43:15
60:13, 21
conducts 86:1
confirming 28:6
conflict 51:11
conflicting 46:12, 19
55:21
Conrad 29:6 47:15,
18
consideration 50:10
55:3
considered 31:9
33:2 38:13 46:21
52:7 56:5 58:21
73:16 80:4
consisting 19:7

20:3 47:7
constitute 38:11
consult 72:2
contact 41:10
47:10, 13
contacted 13:16
19:22 47:5 49:7
50:21 61:22, 23
68:18
contacting 47:18
context 42:24 43:10
continued 24:19
contradictory 46:19
conveyed 47:20
convicted 8:6
COOK 1:7, 16
2:12 3:18, 20 4:6,
10, 12 10:23 12:9,
14 17:18 24:9
26:17, 22 32:23
34:19 46:13 64:22
90:1, 10 92:5, 13
93:20
copies 56:24
copy 49:3 54:9
cordial 69:12 72:5
correct 16:12
35:17 48:10 59:23,
24 60:4 65:21
67:7 86:9 87:18
92:23
correction 53:3
Correctional 11:1, 3
12:2, 13
Corrections 11:23
72:19 88:1
correctly 87:14
91:5, 9
counsel 7:18 88:18
93:2, 8
COUNTY 1:7, 16
2:12 3:18, 20 4:6,
10, 12 10:23 12:9,
14 14:16, 17 15:3
17:18 24:9 25:20
26:17, 22 32:23
34:19 46:13 64:22
90:1, 10 92:3, 5, 13
93:20
countywide 25:24
county-wide 25:16

Deputy Chief Theodore John Stajura — 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 33 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

couple 6:8 74:4
86:17
course 22:12 71:6
78:15 89:9
COURT 1:1 6:13
15:3 77:15, 17
79:15 90:23 91:13,
17 92:11
courthouses 27:8
courts 53:2
cover 81:2 84:13
covered 25:18
covering 33:21
covers 75:1
create 22:22
credentials 27:17
crime 8:6
crimes 20:10 24:6
Criminal 9:1 15:10
22:5 27:3
CRR 1:23
CSR 1:23
current 32:23 71:16
currently 13:5
15:23 34:2 45:16
cut 18:16

< D >
Dana 3:23 81:4
84:16
DART 1:8 5:6
92:14
DART000452 4:13
DART000453 4:13
DART135 3:23
DART138 3:21
DART139 3:21
DART26 4:9
DART28 4:9 65:17
DART3 3:19
DART33 4:11
DART4 4:7 63:19
DART7 4:7
database 27:24, 24
date 59:19 64:14
dated 3:23 4:6, 8,
10
day 1:16 21:17
22:3 28:1 45:2, 11
47:12, 22 54:19, 21

61:15 69:21, 22
93:13
days 28:1 38:10, 16
40:4 70:11 88:2
day-to-day 21:1
DCI 78:1
December 93:14
decide 91:10
decision 21:19
22:20 23:10
Defendants 1:9
2:18 92:14
Department 3:18
4:6, 10 11:23
13:12 16:19, 22, 23
18:15 19:13, 15
24:8 25:5 26:17
29:2 30:15 31:1, 3,
12 32:4, 18, 24 34:3,
17 37:14 38:1, 6, 11,
12, 17, 19, 22, 23
40:13 41:1 42:5
47:6, 11, 16, 24 48:3,
6 50:17 52:10, 14,
24 68:6, 9, 13 69:19
70:22 72:19 76:17
78:13 80:2, 3 87:8,
10, 24 90:2
department-member-
involved 32:15
Department's 79:14
depending 25:18, 23
35:13 42:10
depends 79:7
deployment 31:15
deployments 32:1
deponent 2:19
deposed 5:22, 24
6:4
deposition 1:13
3:13 4:1 5:4, 7
7:18, 21 43:5, 21
51:20 63:9 65:5
73:3 74:1 81:23
93:2, 5, 6
deputies 27:10
DEPUTY 1:13 3:7,
14 4:2 5:4, 11, 16
12:14 23:2 29:4
35:20, 22 36:3
37:3 44:16 45:16

47:7 48:14 49:2
51:5 57:2 59:8
64:3 81:3, 13
84:16 92:9
Deralyn 1:15, 23
92:4 93:19
DESCRIPTION
3:17 4:5
designee 87:8, 11
desk 27:21, 24 28:5
detailed 59:5
Detective 10:7
21:15
determination 37:22
39:9 81:15
determine 78:12
89:10
determined 88:6
89:1
DH 52:13
difference 38:21
different 29:22
37:14, 24 56:19
90:6
diligent 61:24
Direct 19:6 25:22
26:3 41:24 63:17
directing 64:17
directly 29:7
discharge 32:8
disciplinary 43:17
discipline 30:22
32:24 33:19, 23
34:4, 5 38:7, 16
40:3 52:20, 22
53:2, 4, 6, 7 54:5
72:21 73:4, 14, 16,
18 77:23 82:6, 14
83:9
discourteous 22:4
discovered 59:11
discovery 1:13
discretion 18:17
discuss 8:9 39:18
60:23
Discussion 54:13
displaying 66:22
DISTRICT 1:1, 2
15:4, 7 19:3, 19
92:11, 12

Division 11:7 15:17,
23 25:11, 13 26:13
27:10 50:8, 15, 19
59:4 61:22 75:12
divisions 40:23
doctor 62:10
doctors 69:5
doctor's 85:17
document 43:8
44:4, 15 51:23
52:1, 11, 17 53:8
63:14, 20 64:10, 14
65:11, 13 71:3
74:5, 7 75:1, 7
81:10 82:4
documentation 49:6
58:18
documenting 84:3
documents 7:20, 23
55:1 66:10 77:19
83:20 84:5, 21
doing 15:21 61:5
download 31:20
dozen 6:1
dried 25:3, 9
driving 41:7
Drug 24:21
due 47:6
duly 5:12 92:16
duties 11:18 15:5
19:4, 16 21:22
24:2 25:21 29:19,
21, 24 35:24 36:16
45:18, 23
duty 31:11, 16

< E >
earlier 18:16 40:3
45:11 54:8 67:22
83:16 89:9
early 45:6
education 8:9
effect 89:24
Egan 75:13
Eight 11:7
eight-week 21:15
either 25:19 39:23
42:16 54:2 56:11
62:8 66:10 77:15
78:17 80:5

Deputy Chief Theodore John Stajura — 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 34 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

electronic 20:5
ELIZABETH 2:5
elizabeth.fleming@da
nherbertlaw.com 2:9
employed 50:16
employee 75:8
employment 50:12
55:4 74:22 86:23
enforcement 9:23
10:21, 22 15:11
16:20, 21, 24 17:2, 5
19:10 77:13
ensuring 32:4
entered 27:23
entering 27:8
entire 7:24 25:19
26:22 49:15 61:10
entities 75:9
equipment 30:3
31:13
Erica 47:15
err 61:4
erratically 41:7
escorts 11:19
ESQ 2:5, 13
essay 13:9, 14
essentially 32:3
75:16
establish 88:12
89:16
et 1:8 92:14
Evaluation 87:4
event 45:5 47:21
49:15 62:21 87:7
everybody 16:3
77:6 91:3
everybody's 90:6
evidence 34:20 77:3
exactly 17:2 24:14
37:22 41:16 54:5
60:18
exam 17:17
EXAMINATION
3:6 5:14 12:16, 17
13:2 17:16 86:15
89:21
examined 5:13
example 80:1
executive 10:11
29:8 45:2, 9, 17, 19

46:6 50:2 60:10
61:13, 18
exempt 22:23
Exhibit 43:5, 21
51:20 63:9, 11
65:5, 8 74:1 81:23
86:19
EXHIBITS 3:13, 15
4:1, 3
existence 9:13
experience 28:14
29:11
explain 39:19
53:14 90:22
explained 50:8
69:17 72:6
explaining 41:12, 19
53:16
explanation 61:8
exploitation 20:4
expressway 41:8
external 11:13, 15
12:1
extortion 20:11
extraditions 27:11

< F >
facility 54:21
fact 51:18 59:8
62:17 64:19 87:16
88:9
failed 87:9 88:12
fair 7:3 33:22
78:22 88:10 89:1
falls 34:24 38:8
false 55:14, 15, 18
57:4, 15, 21 58:13
66:24 67:16 68:12
75:21, 21 76:4, 24
85:20 88:6, 10
falsified 67:3 76:7
FBI 10:8
federal 24:10 27:17
federally 24:24
federally-funded
24:22
feel 61:3
felt 18:15 19:16
21:2
field 14:14, 19, 21,
24 18:3, 11

file 64:11, 13 83:17,
21 84:6 86:9
filed 42:18 57:1
fill 44:11
filled 85:18
find 89:8
findings 39:6 72:13,
14 80:9
finish 6:18
finished 43:9 44:1
63:15
FIRM 2:4
first 5:12, 17, 18
8:10 23:2 29:4
34:12 39:22 45:16
47:21, 22 50:16
62:19 63:18 64:3
66:20 69:21, 22
81:3, 13 82:3
84:16 92:16
five 22:3 28:17
FLEMING 2:5 3:8,
15 4:3 5:3, 15
43:3, 7, 20, 23 51:22
54:15 56:3 63:8,
12, 13 65:7 66:12,
15 73:23 74:3
76:19 79:4 80:15
81:22 82:1 83:14
86:12 89:22 90:20
91:14, 15
Floor 2:14
focus 29:23 66:17,
19
follow 7:9
following 37:16
44:9, 10 70:6
follows 5:13
followup 37:21
followups 57:8
89:23
footage 78:18
force 19:12 24:1, 4
26:7 27:18
foregoing 92:22
93:2
form 49:3 53:8, 8
54:9, 17 55:7
73:19 76:8 79:1
80:12

formal 34:10 37:14
38:13, 14 40:4
44:12 47:3 52:3, 5,
7, 9, 14 60:16, 24
61:4 62:8, 9 70:12,
21, 22
formally 30:2 51:16
formatting 39:5
forms 33:11 37:20
52:23
forwarded 60:15
foun 76:8
found 80:18
foundation 48:23
55:6 66:9 73:20
79:1, 12 80:12 83:4
four 11:9 22:10
29:11
four-year 23:7
frame 23:13
frequently 42:6, 11
68:3
Friday 21:17
fugitive 24:12
26:17, 20, 23 27:21
28:12
full 23:2
fully 7:2, 14 64:21
66:3
function 64:21 66:3
funded 24:24
funding 24:20 25:3,
9
further 22:13 42:1
43:15 46:20 47:9
48:10, 22 51:4, 13,
19 56:22 58:8
61:21 68:5 77:2
78:11 83:8 86:14
89:20, 21 90:21
92:15 93:1, 4, 8

< G >
gambling 20:10
gear 18:6
General 3:20 77:7
generally 7:17 37:7
56:9 75:20 78:23
generate 41:13
42:17, 19 53:20

Deputy Chief Theodore John Stajura - 6/28/18
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 35 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

generated 39:*16*
46:*18* 49:*4, 11, 19*
51:*8, 14* 59:*13, 15*
60:*4* 61:*7, 16, 18*
62:*6* 63:*22* 65:*13*
69:*23* 75:*16* 84:*1,
3, 11, 14*
generating 53:*19*
gentleman 59:*2*
getting 37:*4* 41:*18*
give 22:*13* 42:*23*
54:*2* 81:*7*
given 15:*1* 17:*17*
23:*1* 38:*14* 47:*1, 3*
92:*18, 24*
gives 76:*24*
giving 41:*22*
go 6:*8* 8:*22* 9:*11*
12:*7* 13:*1* 14:*12,
22* 17:*4* 19:*21*
21:*11* 23:*14* 26:*15*
28:*21* 35:*12, 23*
48:*24* 69:*10* 76:*9*
80:*13*
goes 57:*12* 84:*14*
going 6:*8, 24* 11:*22*
20:*20* 24:*5* 27:*12*
28:*23* 30:*8* 39:*23,
24* 41:*20* 48:*16*
54:*2* 63:*17* 69:*5*
70:*1* 73:*23* 76:*23*
81:*4*
gold 23:*1*
Goldsmith 37:*4*
44:*17* 47:*8* 48:*11,
15, 21* 49:*2* 51:*5, 8,
18* 54:*8, 16* 57:*2*
59:*8* 61:*21* 69:*14*
84:*3*
good 13:*18*
Gordon 1:*15, 23*
92:*4* 93:*19*
graded 17:*19*
graduate 8:*16, 18*
9:*3, 24*
graduated 9:*5, 6*
21:*17*
graduation 8:*20, 21*
grand 77:*17* 79:*16*
greeted 69:*13*

grievances 31:*2*
ground 6:*9*
guess 36:*1* 50:*3*
57:*16* 72:*8* 77:*12*
80:*1*
guys 80:*6*

< H >
half 9:*17*
hand 69:*15* 93:*13*
handicap 50:*22*
57:*19, 20* 59:*4*
65:*1* 66:*22* 83:*23*
handicapped 45:*14*
49:*9* 58:*6* 60:*12*
64:*20* 65:*20* 66:*2*
69:*7* 71:*8*
handle 21:*4* 31:*1*
33:*12*
handled 19:*17*
33:*12* 38:*22* 39:*10*
52:*19* 53:*7* 67:*13*
handles 31:*2* 78:*23*
Handling 15:*8* 76:*3*
hands 81:*20*
hanging 59:*12*
happen 42:*11, 16*
68:*2, 7* 79:*20*
happened 23:*8*
25:*8* 62:*18*
happens 13:*15*
42:*6* 81:*19*
hard 72:*22* 90:*3*
head 6:*12* 38:*1, 11,
12, 18, 19* 52:*10, 14*
68:*6, 9, 13* 70:*22*
76:*17* 78:*13* 87:*8,
10*
headquarters 69:*1*
heads 37:*14* 38:*22*
40:*13*
heart 66:*5, 11*
held 22:*24* 29:*17*
54:*13*
HENRETTY 2:*13*
3:*9* 48:*23* 55:*6*
63:*11* 66:*7* 73:*19*
76:*8* 79:*1* 80:*12*
83:*4* 86:*16* 89:*19*
90:*22* 91:*19*

HERBERT 2:*4*
hereinbefore 93:*7*
heretofore 92:*6*
hereunto 93:*12*
HIDTA 24:*20* 25:*1,
3* 28:*13*
high 8:*12, 14* 24:*21*
higher 48:*12* 53:*22*
64:*3, 4*
higher-ranking 23:*5*
53:*24*
higher-ups 64:*1*
high-profile 24:*6*
hook 31:*20*
hopefully 81:*17*
90:*14*
hospital 11:*19*
hospitals 11:*20*
hour 47:*21* 62:*19*
66:*20*
hours 28:*1*
HR 75:*12*
Human 50:*8, 15, 19*
74:*11* 87:*11, 18*
hurt 72:*8*

< I >
identification 43:*6,
22* 51:*21* 63:*10*
65:*6* 74:*2* 81:*24*
IDENTIFIED 3:*17*
4:*5* 62:*15* 69:*15*
77:*14* 90:*8*
identify 15:*22*
42:*14* 53:*9* 67:*23*
ILLINOIS 1:*2, 16,
18* 2:*7, 15* 8:*15*
49:*7* 59:*3* 70:*7*
92:*1, 5, 9, 12* 93:*20*
immediate 53:*6*
87:*7*
immediately 23:*8*
48:*1, 3* 61:*14, 24*
72:*3*
impaired 7:*15*
important 6:*9*
imposed 38:*8* 73:*4*
83:*9*
improperly 85:*19*
incident 44:*22*
48:*21* 49:*19* 52:*18*

54:*22* 56:*5* 59:*23*
62:*20* 82:*20*
incidents 37:*20*
include 27:*12*
included 84:*9*
inconsistencies
60:*11* 68:*22* 69:*18*
71:*12* 76:*13* 77:*7*
89:*13*
inconsistency 89:*12*
inconsistent 57:*4*
58:*1, 13* 60:*17*
67:*16* 68:*12* 75:*21,
23* 76:*4, 16* 88:*7, 11*
independently 17:*17*
indicated 65:*24*
indicates 82:*17*
Indicating 10:*16*
individual 28:*5*
30:*17, 24* 31:*10*
42:*17* 44:*10, 13*
58:*20* 59:*11* 75:*12*
77:*14* 79:*15*
individuals 12:*19*
13:*17, 20* 15:*22*
17:*20* 23:*5* 24:*5*
27:*16* 28:*7* 31:*14,
21* 35:*3* 62:*23*
informal 70:*18*
information 46:*12*
55:*16, 19* 61:*3*
62:*2* 63:*3* 67:*1*
91:*16*
informed 76:*5*
infraction 35:*14*
53:*10, 10, 14*
initial 5:*19* 67:*20*
79:*8, 10*
initially 20:*23* 22:*7*
32:*19* 42:*11, 18*
44:*24* 46:*16* 48:*11*
49:*14* 53:*21* 57:*10*
59:*11* 63:*6* 66:*20*
67:*18* 85:*3*
injury 85:*11*
inquiries 33:*24*
37:*9, 10, 13, 17* 38:*2,
4* 40:*11, 15* 41:*3*
52:*6* 56:*10* 67:*19*
68:*8* 70:*4* 78:*9*

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 36 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

inquiry 38:6 39:11, 13 46:22 52:8, 13, 13 56:6 58:24 59:18 67:12, 21, 23 68:4 70:9, 19 73:2, 17 80:10 82:10 83:2
inspect 30:3
Inspectional 32:20 33:2, 4 70:2 77:22
inspections 30:2, 5 33:1 34:4 77:23
Inspector 3:20 22:22, 23 23:18, 23 29:1, 16 35:22 36:23 37:2, 3 44:16 47:8 48:14 49:2 51:5 57:2 59:8
inspectors 37:1
instance 36:12 41:6 90:7
instructed 49:10 61:20 68:20
instructions 47:4, 5
instructor 34:24
Intensity 24:21
interacting 35:5
interest 15:24
interested 93:10
Internal 3:20 21:18, 23
interpretation 43:11
interrogate 72:9
interrogated 70:23
interrogation 40:12 70:12
interview 13:11, 15 41:15 49:13, 13 58:20 59:1, 6, 9 60:24 65:13 66:5 69:3, 12 70:15 71:6, 7, 9, 15 72:5 84:4, 9
interviewed 58:23 59:5 62:11, 16 64:24 65:19 67:7 68:17 85:5
interviewing 58:17
interviews 37:18

40:10, 11 70:3
invest 70:21
investigate 32:9 35:14 51:13 84:17 88:20 89:4
investigated 40:16 52:20 56:10 59:24 78:3 80:5
investigating 58:12 67:22 84:12
Investigation 4:8 34:13, 15 35:10 38:11, 12, 13 39:1, 6, 10 40:4 42:2, 21 43:15, 18 44:22 46:2, 8, 24 51:4, 6, 17 52:3, 5, 9, 10, 15 56:15, 16 58:9 59:17 60:13, 22 61:4 62:7, 24 64:5 65:12 66:6, 18, 19 68:1, 3, 6 69:2, 8 70:12, 18, 23 72:11, 15 73:5 76:3, 11 77:2 79:8, 11, 21, 23 80:11, 22 81:11, 18 82:24 83:7 86:4 89:1, 10
investigations 9:8 15:10, 10 19:9, 13 20:5, 11 21:4 22:5, 18 23:4, 11 30:1 31:5, 24 33:8, 10, 11, 17, 23 34:7, 8, 10, 16, 18 35:2 36:14, 19 37:8, 15 38:1, 18, 19, 20 40:13 52:7, 24 56:18 58:14, 16 67:12 68:10, 12, 13 75:20 76:12, 18 78:14, 24 79:18 84:2 85:24 89:15, 18
investigative 7:24 61:1 62:14 63:22 64:11, 13 83:17, 20 84:6
Investigator 21:23 46:16 49:14 51:19 55:16 57:9, 11

59:10 62:22 63:2, 6 80:24
investigators 20:20 21:3, 5 27:15 39:2 69:10
involved 30:17 31:22 44:21 47:23 52:18 63:4 67:15
involves 76:4
involving 19:14 22:14 37:20 44:22 69:20 75:21
issue 34:23 41:23 50:12 52:20, 22 55:5, 12, 14, 24 56:2 57:12 64:19 66:1 77:8 85:3, 8, 12 87:18 89:11
issued 27:23 38:2 59:6
issues 50:23 51:7 85:1
issuing 49:8
IX 87:4

< J >
January 14:4, 4 36:2
Jeff 49:14 59:10 68:24 69:21 84:4 85:4
Jefferson 1:17 2:6 92:8
Jewel 9:10
job 22:6 61:5
JOHN 1:14 3:7, 14 4:2 5:11, 19 29:6 37:6 51:16, 19 69:14 92:9
Jonathan 3:21
Judge 79:14 80:2
judges 27:7
July 45:3 46:7, 21 56:7, 8 59:15, 18, 18, 22, 23 60:17
jump 21:3
June 1:16 3:4 92:7
junior 16:8
jury 77:17 79:16
justice 9:1

< K >
kind 21:13
knee 85:3, 7, 11
know 11:4 12:20 17:21 21:19, 20 32:3 34:3 38:10 39:8 40:21 41:21 43:9 44:1 45:21 47:24 48:16 49:22 50:1 54:16 56:11 57:13, 24 58:23 60:18 61:4 63:14 69:6 73:21 76:7, 10, 14 80:16 81:15, 18 82:3, 19, 23, 23 89:24 90:7, 20 91:7
knowing 48:14
knowledge 7:3 20:22 36:20 80:20 83:13

< L >
labeled 63:18 65:17 70:18 82:10
lady 47:14
Lane 46:16
Lange 49:14 55:16 57:9, 11 59:10 62:22 63:2, 6 68:24 69:21 84:4 85:4
large 27:14
LAW 2:4 9:23 10:21, 22 77:13
Lawrence 8:15
lawsuit 8:11
Lawsuits 6:3 34:17
leave 9:21 37:4
leaving 48:15
led 79:19
left 9:19 10:20 22:11
Legal 31:3 34:17 47:6, 10, 16, 24 48:3, 6
Letter 3:21
level 33:12, 14 67:24
levels 22:1

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 37 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

Lewis 8:23 10:4
LICENSE 1:24
lied 79:15
Lieutenant 23:16, 24 25:10, 12, 14, 16 26:12, 24 29:18 43:14, 15 45:12 46:17 49:12, 18 50:1, 6 55:18 59:6, 14 60:3, 6 61:17, 18 63:4 64:22 69:24 84:2
lieutenants 22:18
limited 25:15 26:2
line 20:9 38:9 74:16
lines 50:5
list 12:19 13:18 17:19, 20 53:10
listed 50:1
lists 82:13 83:1
literally 47:19 62:19
little 22:13 42:23 62:5 76:1
local 27:11, 24
long 9:15 11:24 14:8, 18 15:12 16:14 17:7 18:8, 12 19:18 21:8 22:9 24:15 26:12 28:16 48:16 61:6 70:14
longer 9:13 50:16
look 37:12 43:24 46:19 47:2, 4 48:9 49:17 50:5 60:10 61:14, 21 68:4 76:14 77:3 78:11, 21 86:22
looked 41:17 58:4, 8
looking 37:18 42:13 43:11 47:9 48:6, 12, 17, 21 51:1, 7 52:11 55:11 60:7 67:3 69:4 71:12 83:22, 23 85:1 89:11
loose 18:16
loss 9:7, 9, 20

lot 22:14 25:15 29:22 37:13 39:12, 13 42:8
loud 6:10
LYLE 2:13
lyle.henretty@cookco untyil.gov 2:17

< M >
maintained 23:17
major 8:24
making 33:20 81:5
maliciously 31:22
management 10:11 33:24 37:9, 10, 13 38:2, 6 39:11, 13 40:11, 15 41:3 46:22 52:6, 12 56:6, 10 58:24 59:18 67:12, 18, 21 68:4, 7 70:4, 9, 18 73:2, 17 78:9 80:10 82:10 83:2
Manager 9:20
Manual 74:23 86:24
Mark 43:3
marked 43:6, 22 51:21 63:10 65:6 74:2 81:24
Markham 19:3, 19
Marshals 23:21, 24 24:4, 17 26:19 27:16, 18 28:12
master 10:2
matter 5:5 8:1 46:20 48:10, 16 51:2, 3 60:15 89:11
maximum 38:7 73:4
Meadows 15:3, 7, 13
mean 8:4 20:9 21:21 31:7 43:2 57:6, 7 72:22 73:22 84:22 89:5 90:3
meaning 60:21
means 7:6 20:8 57:14 91:4
medical 30:11, 12 49:3, 6 50:23 54:9,

17, 21 55:1, 12, 23 61:22 69:4 71:5, 11 84:5, 21 85:1
medically 50:11 55:4
meet 87:9 88:12
member 32:4 53:24 76:5 80:2, 3 90:2
members 13:11 19:15 22:15 58:2
memo 43:11 81:2 86:20
Memorandum 3:18 4:6, 8, 10 39:15 41:4, 11, 13, 18 42:12 43:17 46:17 49:18 50:21 53:16 55:20, 21 59:9, 15 60:4 64:23 65:12 68:23 69:23 74:10, 13 75:4, 15 76:15 84:8, 13 87:12, 16 88:3
memorandums 33:20 42:9 49:11 58:17 59:13 61:16 77:18 83:24 84:2
mentioned 10:20 31:6 32:11 33:6 40:3 48:8 54:8 83:16 84:24 93:7
Merit 12:15 17:18 22:24 23:16, 23 25:10 29:17 74:17 75:1 81:6 87:3, 13 90:18
MI 52:12
middle 5:19
Mike 29:5 37:4 44:17 51:5, 8, 12, 14, 18 61:21 69:14 84:3
miles 27:12
mind 75:10
minor 9:2 33:13, 16 35:9
minutes 70:16 74:4
mirror 59:12
misappropriation 30:8

misconduct 19:14 21:24 22:14 37:19 40:21 41:24 52:18
misrepresentation 51:8
mission 29:23
mistakes 77:6
misunderstanding 61:8
month 18:14, 21, 24
months 11:9 19:20 26:14
morning 45:6, 7
motor 15:9 17:5
move 8:10 42:1
moved 25:4
multiple 33:7 45:23 89:13
municipal 28:3
municipalities 13:23
murder 24:6
Myslinski 3:21

< N >
name 5:18, 20 29:6 47:15 49:20 50:1 59:2 69:16
named 44:14
names 5:17
Nancy 50:7, 14, 22 60:7 74:11 75:11
narrative 57:3
Nathan 64:22
National 10:8 27:24
nature 56:15, 17 66:8 69:8
need 6:10 7:5 25:18 41:11
needed 19:16 37:21, 22 68:20 69:24
new 16:19 19:2 29:23, 23, 23 36:16
newer 36:11
Ninety 41:14
Nods 6:12
nonaccidental 32:8
noncredible 90:11
north 14:16 15:2, 13 25:19
NORTHERN 1:2 92:11

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 38 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

Northwestern 10:*11*
18:*5, 9*
notarial 93:*13*
notary 1:*15* 92:*4*
93:*20*
Notice 1:*19* 5:8
30:*20* 93:*5*
notification 16:2
52:2 74:*10, 12*
75:*4, 9, 15* 85:22
notifications 83:*10*
notified 45:*1, 7*
48:*3, 7* 80:*17*
notify 35:*11* 85:*13*
87:*11, 17*
NUMBER 3:*17* 4:*5*
16:*5* 47:*3* 61:*7, 9*

< O >
Object 48:*23* 66:7
73:*19* 76:8 79:*1*
80:*12* 83:*4*
Objection 55:6
objections 53:*16*
observed 41:7
obtain 10:5 31:*21*
49:*10* 58:*19*
obtained 49:*3* 54:*9,
17* 59:9 84:8
obtaining 33:*19*
34:20 57:*19, 20*
58:*17*
occur 23:6
occurred 37:*23*
40:22 41:*16* 43:*12*
45:5, *10* 47:*21*
53:*17* 61:9 62:*19,
21*
occurrence 45:*3*
occurring 49:*15*
68:*23*
October 82:*13* 83:*1*
offensive 8:*4*
Office 3:*20* 4:*12*
10:*23* 21:*20* 22:*17,
21* 23:*3, 21* 24:9
25:2 26:*19* 27:4
28:*24* 29:8 30:*24*
32:*22, 24* 33:*15*
34:*5, 11, 22* 37:*11,
21* 38:*3, 20, 24* 39:*8,*

18 40:*24* 47:2, *20*
50:*2* 51:*15* 52:2
60:*10* 64:*2, 3* 66:*4*
77:*22* 78:*23* 80:6
82:*6* 83:*8* 86:2, *5,
8* 88:*5* 90:*2, 10*
Officer 11:*1, 3*
12:*2, 8, 13, 24* 14:*14,
19, 22* 15:6 16:*9, 11*
17:*15* 26:*24* 28:*14*
40:*16, 17* 41:*12, 13,
20, 23* 44:9 45:*2, 9,
17, 19* 46:6 61:*13,
19* 70:*3, 7* 75:*13, 22*
84:*12* 90:*5, 8*
officers 14:*15*
15:*24* 16:*21* 19:8
21:6 37:*16* 38:9
71:*17*
Officer's 70:7
official 44:*8* 77:*17,
18*
oh 43:*4* 72:*13*
74:*19*
Ohio 9:*14*
okay 6:*14, 21* 7:*10*
8:*8* 10:*17, 19* 12:*4,
22* 13:6 14:*1, 6*
17:*23* 18:20 24:*11*
25:*17* 27:*1* 28:*20*
29:*13* 31:*18* 32:2,
*10* 35:*15, 23* 36:*8,
21* 39:*3* 40:2, *6, 14,
19* 42:*3, 20* 43:*10,
19* 44:*2, 6* 45:*24*
46:*4, 10* 48:*19*
49:*1* 50:*4, 13*
52:*16* 53:*5* 54:*7,
12, 23* 55:9 56:*4, 23*
57:*23* 58:*7, 10, 22*
62:*13* 63:*8, 16*
64:*6, 9, 16* 65:*2, 10,
15, 22* 66:*13* 67:*5,
11* 68:*15, 18* 70:*5,
13* 71:*18, 21* 72:*4,
16, 20* 73:*23* 74:6
75:*14, 19* 77:*9, 20*
78:*6* 79:*5, 12* 80:*8,
8, 21* 81:*22* 82:*8, 12,
22* 83:*15, 19, 22*

84:*19* 86:*7, 11*
88:*16* 91:*12*
Once 12:*17* 21:2
56:*5* 77:*1* 80:*23*
83:*6*
one-form 53:*7*
one-on-one 62:*18*
ones 34:6
on-the-job 20:*17*
26:*11*
operate 36:*14*
operation 20:*23*
24:*23*
operations 11:*13, 16*
12:*1* 19:*23* 20:*1, 4*
21:*1*
opportunity 9:*11,
22* 10:*21* 11:*12*
12:*15* 23:*20* 60:22
OPR 4:*12* 40:*13*
52:*20* 60:*15* 73:6
oral 13:*11, 15*
55:*16* 66:*24* 69:*20,
21*
orally 58:*1*
order 91:*17*
ordered 91:*1*
ordering 91:*13*
orders 61:*13*
organized-crime
20:*11*
original 91:*14, 18*
outcome 72:*10*
73:*11* 93:*11*
outfitted 34:*21*
outside 11:*14*
overall 59:*17*
overseeing 75:*11*
overseers 34:*4*
oversees 59:*3*
oversight 19:*8*
31:*17* 50:*18*
overtime 26:*8*
overview 63:*21*
64:*5*
overweights 17:*4*

< P >
packet 7:*24*
page 63:*18* 65:*16*

82:*9*
paper 41:*16*
paperwork 39:*4*
paragraph 63:*19*
65:*17* 75:6 86:*22*
part 14:*16* 19:*14*
23:*10* 27:*17* 28:*12*
64:*10*
particular 60:*14*
parties 5:*10* 93:*3, 9*
partner 23:*3*
pass 14:*24*
passing 12:*18*
path 69:*10*
Patrol 15:*17, 23*
16:*1* 25:*11, 13*
26:*13*
pattern 77:*7*
pay 26:*7*
Peace 37:*16* 38:9
44:*9* 70:*7*
penalty 72:*17, 18*
pending 7:*8* 92:*10*
people 11:*22* 58:*17*
63:*4* 89:*5*
percent 41:*3, 14*
performance 31:*16*
35:*5*
perimeter 11:*21*
Period 87:*5*
perjured 80:*3*
permitted 71:*14*
person 29:*5*
personally 92:*7*
personnel 18:*6*
pertain 74:*13*
pertaining 8:*1* 27:*4*
36:*11* 41:*24* 45:*13*
46:*14* 62:*3* 65:*1*
68:*22* 71:*4* 80:*22*
84:*8*
pertains 74:*14*
76:*10* 77:*12, 13*
Phar-Mor 9:*12, 16*
10:*20*
phone 13:*16* 42:*8*
45:*12* 59:*1*
pick 28:*24* 76:*23*
pickups 27:*11*
placard 45:*14* 49:*9*
50:*22* 55:*24* 57:*9,*

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 39 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

*14*, *19*, *21*  58:*6*  59:*4*,
*11*  60:*12*  65:*1*
66:*22*  67:*4*  83:*23*
85:*11*, *16*, *20*
**place**  13:*5*
**placed**  21:*12*  84:*5*
**Plaintiff**  1:*5*  2:*10*
92:*13*
**please**  5:*16*  6:*18*, *23*
**PM**  91:*22*
**point**  13:*16*  14:*23*
15:*18*  16:*7*, *18*
22:*20*  23:*22*  26:*16*
41:*9*  42:*15*  47:*16*
48:*13*  51:*3*, *14*
53:*13*, *18*, *24*  55:*13*,
*22*  57:*17*  60:*9*, *12*,
*18*, *20*, *21*  61:*20*
62:*1*, *7*  63:*1*  67:*24*
69:*19*  71:*13*  87:*23*
88:*5*
**pointed**  85:*15*
**Police**  3:*18*  4:*6*, *10*
10:*7*  12:*8*, *9*, *24*
13:*12*, *24*  14:*3*
15:*6*, *8*, *24*  16:*9*, *11*
17:*15*  18:*6*  19:*8*
21:*6*, *15*  22:*8*, *23*
23:*18*  24:*8*  25:*5*,
*10*  26:*17*, *23*  28:*14*
29:*1*, *2*, *16*, *18*  30:*15*
31:*1*  32:*18*, *24*
33:*14*  35:*22*  36:*23*
37:*1*, *2*  38:*6*, *23*
41:*1*  44:*19*, *23*
45:*17*  46:*15*  47:*22*,
*23*  49:*4*  50:*9*
52:*24*  57:*5*  62:*22*
64:*19*, *21*, *22*, *24*
65:*14*  66:*1*, *3*  70:*7*
71:*17*  74:*14*  77:*16*,
*19*  78:*18*  88:*14*
90:*5*, *8*
**policies**  33:*21*
**policy**  37:*19*
**portion**  18:*11*  57:*3*
**position**  12:*24*  18:*7*
22:*22*  23:*22*  50:*20*
81:*14*  87:*10*  88:*13*
**positions**  22:*23*

**possibility**  56:*19*
**possible**  37:*18*
**possibly**  85:*18*
**posted**  12:*18*  17:*19*
**potential**  22:*5*
**power**  13:*3*, *4*, *7*, *14*
**preliminary**  42:*21*
51:*6*
**preparation**  7:*21*
**presence**  92:*20*
**PRESENT**  2:*1*
67:*6*  71:*15*  93:*6*
**presented**  38:*17*
40:*8*, *17*  43:*13*
69:*19*  70:*24*
**pretenses**  85:*20*
**pretty**  42:*14*
**prevention**  9:*7*, *9*, *20*
**previous**  87:*13*
**prior**  20:*21*  28:*12*,
*13*  29:*12*  52:*8*, *23*
60:*6*  61:*13*  62:*8*
78:*9*  83:*6*
**prisoner**  11:*19*, *20*
27:*11*
**private**  9:*7*
**probation**  75:*3*
**Probationary**  87:*5*
**problem**  55:*10*, *22*
57:*12*  91:*10*
**problems**  85:*7*  90:*9*,
*13*
**procedures**  74:*18*
87:*4*  90:*18*
**proceeding**  70:*20*
**proceedings**  91:*21*
**process**  12:*10*
53:*21*  56:*16*  61:*1*
62:*14*  80:*23*  88:*4*
**professional**  10:*1*
34:*6*  35:*5*  37:*11*
38:*3*, *20*, *24*  39:*9*, *19*
51:*16*  52:*3*  78:*23*
80:*6*  82:*6*  83:*8*
86:*3*, *6*, *8*
**program**  14:*14*, *19*,
*22*, *24*  18:*4*  21:*16*
**progressed**  51:*6*
66:*23*
**progression**  35:*21*

**promoted**  17:*12*
18:*1*  23:*16*  36:*3*
**promotion**  17:*14*
**promotional**  74:*17*
87:*3*, *4*  90:*18*
**promotions**  75:*1*
**proper**  36:*14*
**properly**  5:*8*  31:*14*
35:*4*, *9*  36:*15*
85:*18*  91:*8*
**property**  30:*6*
**prosecution**  20:*10*
**provided**  12:*17*
46:*15*  55:*15*, *18*
70:*19*  77:*4*
**providing**  66:*24*
**psych**  11:*8*
**public**  1:*15*  9:*2*
10:*3*  92:*4*  93:*20*
**pull**  86:*19*
**purchase**  31:*11*
**pursuant**  1:*19*  5:*7*
93:*5*
**put**  11:*9*  12:*19*
47:*3*  81:*2*

**< Q >**
**qualified**  32:*5*
**quashing**  27:*9*
**question**  6:*17*, *22*,
*24*  7:*8*, *9*  8:*5*  61:*2*
66:*8*, *11*, *14*  68:*14*
72:*23*  73:*22*  81:*17*
90:*4*, *15*
**questioned**  85:*9*
**questioning**  69:*11*
**questions**  6:*10*  7:*14*
86:*17*  88:*19*
**quick**  86:*17*
**quite**  42:*6*, *11*
67:*17*  68:*2*

**< R >**
**ran**  21:*1*  28:*17*
**range**  22:*4*
**rank**  16:*2*  22:*24*
23:*16*, *17*, *23*  25:*10*,
*14*  29:*17*  36:*3*
74:*17*  87:*3*, *13*
90:*18*

**ranking**  22:*17*
48:*12*
**reach**  47:*14*, *17*
**read**  43:*8*  87:*14*
**reading**  43:*16*
**reads**  86:*23*
**ready**  18:*16*  37:*4*
**realize**  29:*22*
**realm**  77:*13*
**reason**  7:*13*  40:*20*
60:*14*  61:*12*  71:*4*
79:*6*
**reassigned**  82:*15*
**reassignment**  82:*14*
**reassured**  71:*9*
**recall**  6:*4*  13:*10*
54:*10*  72:*10*, *17*
79:*22*
**receive**  18:*1*  20:*15*
22:*2*  26:*10*  28:*10*
29:*9*  34:*8*, *11*  36:*5*
42:*7*  73:*8*, *9*, *13*
79:*21*
**received**  9:*1*  20:*16*
28:*11*  36:*17*  39:*20*
41:*17*  45:*12*  54:*19*
61:*13*  62:*2*  85:*10*
**receiving**  58:*5*
**recommend**  52:*19*
**recommendation**
53:*11*  54:*1*  81:*1*, *5*,
*8*
**recommendations**
84:*18*
**recommending**
33:*22*
**record**  5:*3*  20:*7*
54:*14*  70:*11*
**recorded**  70:*3*
**records**  61:*22*
**Recruit**  44:*19*, *23*
45:*13*  46:*15*, *18*
47:*23*  49:*4*  50:*9*
55:*15*  57:*5*  62:*15*,
*22*  63:*7*  64:*19*, *21*,
*24*  65:*14*, *18*  66:*1*
74:*14*  88:*14*
**recruits**  71:*14*
**reduced**  92:*21*
**refer**  75:*5*
**reference**  71:*6*

Deputy Chief Theodore John Stajura - 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 40 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

referenced 71:*3, 4*
84:*15* 85:*2, 6*
references 52:*12*
referencing 54:*4*
referring 32:*14*
reflect 5:*3*
refusal 34:*12* 39:*22*
regarding 49:*19*
78:*24* 87:*18*
Register 3:*21*
42:*17, 19* 44:*8*
51:*9, 15* 57:*1, 17*
60:*16* 61:*7* 62:*8, 10*
reject 54:*2*
relate 90:*5*
related 15:*9* 55:*23*
93:*9*
release 49:*3* 54:*9,
17*
remain 24:*16*
remember 88:*21*
removal 73:*15* 75:*8*
renewed 85:*16*
repeat 6:*23* 59:*19*
repeatedly 73:*3*
79:*7* 84:*23*
rephrase 6:*23*
Report 53:*1* 63:*22,
24* 65:*24*
REPORTED 1:*23*
92:*19*
reporter 6:*13*
90:*23* 91:*13, 17*
Reporting 50:*6*
55:*14*
reports 31:*21*
77:*16, 19* 78:*19*
representation 71:*2*
representative 71:*15*
reprimand 53:*12*
73:*10* 81:*7*
request 7:*6* 54:*21,
24* 56:*20* 61:*3*
67:*24* 69:*23* 87:*12*
requested 49:*5, 6*
61:*17* 85:*19*
requesting 58:*5*
requests 26:*8, 8*
required 18:*2*
requirements 87:*10*

88:*13*
RESDA 33:*14*
Resource 50:*8*
Resources 50:*15, 19*
74:*11* 87:*12, 18*
respect 17:*14*
18:*12* 50:*24* 58:*24*
80:*9* 83:*21*
respective 38:*22*
93:*3*
respond 6:*11*
response 6:*11*
responsibilities 15:*6*
19:*5, 12* 24:*3*
29:*20, 21* 36:*17*
45:*19*
responsibility 27:*5*
responsible 27:*20*
28:*1, 5* 30:*9, 13, 14,
16, 21* 31:*7* 49:*8, 15*
50:*18*
restructure 28:*23*
restructuring 32:*22*
RETAINED 3:*15*
4:*3*
retired 23:*19*
return 87:*13*
returned 25:*10*
72:*19* 73:*11*
review 7:*20, 23* 8:*2*
30:*10* 34:*6* 37:*11*
38:*3, 20, 24* 39:*9, 19,
21* 51:*16* 52:*3*
53:*21* 63:*14* 74:*4*
77:*1* 78:*23* 80:*6*
82:*6* 83:*8* 86:*3, 6,
8* 91:*2*
reviewed 7:*24*
53:*23* 83:*17*
reviewing 78:*18*
ride 18:*2, 21, 23*
riding 18:*4, 12*
20:*19*
right 6:*16* 7:*12*
8:*8* 33:*21* 34:*12*
36:*10* 39:*22* 44:*3*
56:*8* 57:*14* 60:*2*
61:*11* 70:*21* 73:*15*
76:*20* 79:*24* 81:*20*
89:*7, 19* 90:*16*

91:*1, 7, 19*
Rights 70:*8, 20*
robberies 24:*7*
Robert 75:*13*
role 18:*7* 24:*16, 17*
28:*16* 29:*1, 10*
50:*14* 69:*2*
roll 26:*4, 7*
Rolling 15:*3, 7, 13*
Romeoville 8:*23*
room 30:*6*
ROSDA 53:*1, 8*
roughly 17:*11*
RPR 1:*23*
rude 22:*4*
rules 5:*9* 6:*9*
run 26:*16*
running 48:*5* 61:*24*

< S >
safe 50:*2*
safety 10:*3* 17:*5*
salaries 25:*1*
SANDEFUR 1:*4*
3:*19, 21, 21, 23* 4:*7,
7, 9, 9, 11, 13, 13* 5:*5*
44:*20, 23* 46:*15, 18*
49:*4* 50:*9* 54:*10,
18* 55:*2, 15* 57:*5, 18*
59:*4* 60:*23* 62:*23*
63:*19* 64:*19* 65:*1,
14, 17, 18* 66:*2, 21*
67:*6* 68:*16* 69:*13*
70:*19* 71:*5, 24*
72:*18* 73:*8* 74:*15*
80:*16* 83:*21* 84:*1,
9, 24* 87:*23* 88:*6, 12*
92:*12*
Sandefur's 62:*10*
70:*14* 80:*10*
sat 53:*14*
saying 41:*6* 76:*15*
84:*17* 85:*9* 90:*24*
91:*6*
scenario 42:*4* 81:*9*
scenarios 41:*22*
school 8:*12, 14* 10:*1*
science 10:*3*
scores 12:*18*
scraps 16:*9*
seal 93:*13*

SEAM 74:*19, 21, 22*
75:*5, 7, 17* 87:*1*
88:*4* 90:*17*
S-E-A-M 74:*17*
SEAM, 74:*16*
seasoned 20:*19*
sec 43:*4*
second 75:*6* 82:*9*
86:*22*
Secretary 49:*7*
58:*6* 59:*3* 61:*23*
62:*3* 85:*13, 23*
Section 30:*20*
32:*20* 33:*5* 70:*2*
77:*22*
sector 9:*7*
securing 30:*22*
security 11:*14, 21*
see 52:*11* 56:*23*
86:*20*
seeing 79:*23*
seen 44:*4* 51:*23*
64:*7* 65:*8* 74:*7*
82:*5*
select 11:*12*
selected 11:*13* 12:*8,
23* 13:*18, 20* 16:*20*
21:*14* 87:*9*
selection 12:*10*
15:*20* 17:*22*
selections 12:*20, 21*
send 16:*2* 39:*20*
83:*10*
sending 81:*6*
seniority 16:*3, 5*
sense 12:*11* 41:*18*
43:*14* 44:*24* 55:*24*
56:*13, 14*
sent 39:*17* 54:*20*
87:*24* 88:*9* 91:*3*
separate 64:*13*
September 64:*15*
65:*24* 86:*20* 87:*23*
sergeant 17:*12*
18:*1, 2, 4, 12, 21, 23*
19:*2, 19* 20:*12*
22:*8, 17* 23:*1* 37:*5*
43:*13* 46:*17* 47:*8*
48:*9, 13* 49:*12*
50:*24* 51:*4* 53:*20,
22* 55:*17* 59:*7*

Deputy Chief Theodore John Stajura ~ 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 41 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

61:*17* 63:*3, 23* 64:*24* 65:*23* 84:*13*

**sergeants** 17:*14* 25:*22* 26:*1, 2*

**serious** 42:*14* 76:*12*

**served** 5:*8*

**service** 15:*8* 70:*2*

**Services** 30:*20* 32:*20* 33:*3, 4* 34:*2* 77:*22*

**set** 27:*22* 38:*5* 93:*12*

**seven** 13:*20, 24* 28:*1*

**severity** 64:*18* 66:*1*

**sexual** 24:*7*

**sheets** 19:*12*

**SHERIFF** 1:*7* 29:*23* 92:*13*

**Sheriffs** 12:*14*

**Sheriff's** 3:*18, 20* 4:*6, 10, 12* 10:*23* 12:*9, 15* 13:*12, 24* 14:*3, 9* 17:*18* 23:*21* 24:*9* 25:*2* 26:*17, 22* 27:*4* 28:*24* 29:*7* 30:*15, 24* 31:*1* 32:*22, 23* 33:*14, 15* 34:*22* 40:*24* 46:*13* 64:*2, 22* 74:*22* 86:*23* 90:*2*

**shift** 19:*6*

**shook** 69:*15*

**show** 73:*23* 76:*13* 78:*16* 82:*2* 89:*16*

**showed** 62:*24*

**side** 61:*5*

**sign** 53:*18* 91:*2*

**signature** 49:*21* 93:*1*

**signed** 49:*22* 54:*10, 17* 68:*19*

**signing** 81:*10*

**similar** 38:*21*

**situation** 43:*12* 45:*10* 47:*6* 62:*18*

**six** 19:*7, 20* 26:*14*

**small** 13:*17, 22*

**Smith** 29:*5*

**so-called** 41:*5*

**social** 9:*1*

**somebody** 28:*3* 30:*10* 42:*16* 72:*2* 76:*23*

**sorry** 10:*18* 14:*4, 7* 26:*20* 43:*4* 59:*22* 63:*20* 65:*3* 90:*18*

**sort** 24:*12*

**South** 1:*17* 2:*6* 14:*17* 15:*19* 16:*10, 11, 15* 19:*3* 25:*19* 92:*8*

**span** 23:*7*

**SPAR** 33:*16* 53:*3, 8*

**speak** 7:*17* 32:*5* 40:*23, 24* 68:*21*

**speaking** 37:*7* 56:*9* 88:*18*

**Special** 19:*23* 20:*1, 4, 15, 16* 23:*20* 34:*2, 18* 36:*13* 46:*24* 50:*10* 55:*3*

**specialized** 16:*1*

**specific** 32:*17* 56:*21* 75:*23* 76:*6* 79:*8*

**specifically** 37:*8* 46:*14* 57:*6* 69:*3*

**specify** 57:*3*

**spell** 5:*17*

**spelled** 91:*7*

**spent** 77:*21*

**spilled** 41:*21*

**spoke** 50:*7*

**SS** 92:*2*

**St** 8:*15*

**staff** 10:*11* 13:*11* 18:*15* 19:*16* 21:*21* 22:*15, 21* 29:*7* 33:*18* 47:*7* 58:*3* 68:*21*

**STAJURA** 1:*14* 3:*7, 14* 4:*2* 5:*5, 11, 16, 20* 43:*3, 5, 21, 24* 49:*17* 51:*20* 57:*2* 63:*9* 65:*5, 8* 74:*1* 81:*23* 92:*9*

**S-t-a-j-u-r-a** 5:*20*

**stand** 74:*19*

**stands** 52:*12* 74:*23*

**star** 23:*1*

**start** 11:*15* 42:*13* 47:*9* 67:*18, 22* 68:*3*

**started** 11:*4, 6* 16:*19*

**starting** 49:*16*

**state** 5:*17* 20:*7* 27:*13* 49:*8* 57:*13* 58:*6* 59:*3* 61:*23* 62:*3* 85:*13, 23* 92:*1, 5*

**stated** 52:*8, 23* 55:*1* 61:*12* 73:*3* 75:*6* 76:*14* 79:*7* 83:*6*

**statement** 54:*20* 55:*10* 57:*15* 66:*4* 68:*12* 76:*21, 22, 24* 77:*1, 4*

**statements** 38:*14* 46:*15* 57:*4, 4, 21* 58:*1, 13, 13* 60:*11, 17* 67:*16* 68:*23* 69:*20, 21* 75:*22, 24* 76:*4, 5, 6* 77:*16* 78:*17, 21* 88:*7, 11*

**STATES** 1:*1* 50:*6* 52:*17* 57:*10* 64:*18* 65:*18* 74:*16* 87:*6* 92:*11*

**STATE'S** 2:*12* 13:*4* 34:*19* 90:*10*

**stating** 64:*23*

**stay** 11:*24*

**stays** 61:*10*

**stenographically** 92:*19*

**step** 31:*2* 42:*1*

**stepped** 23:*22*

**steps** 56:*11*

**stood** 69:*14*

**stop** 28:*4* 72:*2*

**stopped** 72:*3*

**store** 31:*10*

**story** 85:*5*

**Street** 1:*17* 20:*10* 27:*15* 92:*8*

**strike** 74:*20*

**subject** 74:*16*

**subsequent** 13:*1* 63:*24*

**Subsequently** 63:*2*

**substantiate** 56:*12*

**successfully** 13:*13* 14:*23* 15:*19*

**suffice** 41:*14*

**sufficient** 88:*11*

**suit** 93:*10*

**Suite** 1:*17* 2:*6* 92:*8*

**Sullivan** 37:*6* 47:*8* 48:*9, 13* 50:*24* 51:*4, 16* 63:*23* 65:*23* 69:*14* 84:*13*

**summary** 52:*19, 22* 53:*2, 4, 6* 54:*4* 82:*7* 84:*11*

**Supervision** 18:*5* 19:*6* 25:*22* 26:*3*

**supervisor** 21:*13* 28:*15* 35:*12* 39:*16* 42:*21* 53:*9, 19* 87:*8*

**supervisors** 20:*19, 24* 27:*19* 68:*20* 69:*22*

**supervisory** 18:*3, 7* 19:*8, 11* 33:*18*

**support** 58:*18*

**Sure** 5:*18* 26:*4* 30:*6* 31:*13, 22* 33:*20* 35:*3* 43:*1* 59:*21* 69:*9* 71:*23* 72:*13* 73:*1* 76:*2* 86:*13* 91:*4, 7*

**suspension** 38:*8* 73:*7, 9*

**sustained** 38:*7* 70:*10* 72:*15* 80:*9* 82:*14*

**sworn** 5:*2, 13* 19:*15* 21:*6* 92:*16*

**system** 17:*14*

**< T >**

**take** 6:*13* 7:*5* 12:*15* 13:*3* 31:*19* 39:*23* 43:*16* 48:*16, 21* 51:*1* 67:*20* 74:*4* 91:*20*

**taken** 1:*14* 5:*7*

Deputy Chief Theodore John Stajura – 6/28/2018
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 42 of 43 PageID #:491
Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.

38:*15* 56:*11* 73:6
**talk** 6:*19* 41:*20*
**talking** 12:*11* 54:6 56:6 57:7, *7, 8* 72:6
**taser** 31:*11, 15, 19* 32:*1, 4, 8*
**tasers** 30:*14* 31:7, *9* 36:*15*
**Task** 24:*1, 4* 27:*18*
**tasked** 51:*17*
**team** 24:*13, 19* 27:*14* 28:*13*
**technical** 20:*5*
**teletrackers** 20:6
**tell** 16:6
**telling** 85:*12*
**Ten** 14:*10* 19:8 50:5
**termination** 38:*17* 81:7
**terminology** 40:*12* 46:*24*
**terms** 90:*17*
**test** 13:*3, 4, 7, 14* 17:*18*
**testified** 5:*13*
**testify** 92:*16*
**testimony** 77:*15, 17* 90:*12* 92:*18, 23* 93:*12*
**testing** 13:*1*
**Thank** 5:*21*
**Thanks** 43:*19* 58:*10* 89:*19*
**THEODORE** 1:*14* 3:*7, 14* 4:2 5:5, *11, 18* 92:9
**T-h-e-o-d-o-r-e** 5:*19*
**thereof** 93:*11*
**thing** 7:7 58:*19* 89:*14*
**things** 36:*11* 42:*15* 78:*20*
**think** 79:*3* 86:*12* 87:*1* 88:*16*
**THOMAS** 1:8 92:*14*
**three** 22:*3* 38:*10* 40:*4* 70:*11*
**three-day** 38:8 73:6, *9*

**time** 7:6 13:*21* 14:*10* 15:*21* 16:4 17:*13* 19:*12* 21:*14, 16* 23:*13* 29:4 30:*12* 37:5 41:*3, 14* 45:*17* 50:*12, 17* 71:*19* 75:8, *10* 76:*23* 77:*21* 81:*3* 84:*15* 90:*12*
**timeline** 87:*22*
**times** 5:*24* 35:*12* 39:*12, 13* 42:8 68:*11*
**title** 9:*18* 22:6, *11* 29:6, *14* 32:*17, 23* 35:*19* 36:*22* 45:*15* 69:*16*
**titled** 29:5, *15* 32:*19*
**today** 7:*15, 18* 35:*19*
**told** 85:*4, 7*
**total** 12:*3*
**totality** 80:*14*
**touched** 42:7 67:*21* 83:*11* 89:9
**to-wit** 92:6
**traditionally** 53:*20* 70:*10*
**traffic** 15:*11* 19:*10* 28:4
**Trafficking** 24:*21*
**trained** 31:*14* 32:5
**training** 10:*12* 14:*3, 9, 11, 14, 15, 19, 22, 24* 17:*24* 18:*3, 11* 20:*15, 16, 17, 18* 26:*10, 11* 28:*10, 11* 29:9 36:5, *9, 13, 18* 45:*11* 46:*14* 49:5 68:*19* 73:*16*
**transcript** 91:2 92:*23*
**Transcription** 92:*22*
**transferred** 19:*23* 20:*12* 21:*18*
**transgression** 33:*13, 16*
**treatment** 50:*10* 55:*3*
**Truck** 16:*20, 21, 24*

17:2
**true** 92:*23*
**truth** 92:*16, 17, 17*
**truthfully** 7:*14*
**try** 6:*19* 61:6
**trying** 57:*16* 72:8
**turn** 59:*17* 65:*16* 82:*3, 9* 89:*16*
**turned** 51:*3* 83:7 86:*2, 5* 89:*12*
**turning** 35:*7*
**Twelve** 14:*20*
**twelve-week** 14:*21*
**twice** 30:*2*
**two** 9:*17, 17* 12:*2, 13* 13:*19* 17:*10, 16* 18:*10, 24* 21:*10* 42:*15* 56:*18* 62:*23* 75:*10*
**type** 13:*1* 17:*24* 33:*22* 34:*14* 36:*17* 39:*5* 40:*17* 43:*17* 56:*16* 71:*10* 76:*10*
**types** 6:2 31:*4* 33:*9*
**typewriting** 92:*21*

< U >
**U.S** 23:*21, 24* 24:*4* 26:*19* 27:*16, 18* 28:*12*
**Uh-huh** 60:*1* 82:*16*
**uh-huhs** 6:*12*
**uh-uhs** 6:*12*
**ultimately** 88:*24*
**unavailable** 47:*17*
**uncommon** 67:*20*
**underlying** 55:*24* 78:8
**underneath** 82:*17*
**understand** 6:*22* 57:*16*
**understanding** 20:*24* 45:5 88:*23*
**understood** 7:*1* 62:*4*
**undetermined** 92:*10*
**Uniform** 37:*16* 38:9 44:9
**uniforms** 30:*3*
**union** 71:2, *15*
**unions** 30:*23*

**unique** 21:*13* 47:6 56:*15, 17*
**unit** 16:*1, 19, 20, 24* 17:*3, 8, 9* 19:*24* 20:2, *13, 17* 21:*1, 6, 8, 12* 22:9, *10* 23:9, *15* 26:*18, 23* 27:2, *3* 28:8, *17* 32:*18* 34:*1, 24* 35:*16, 24* 36:6 37:*1, 5* 39:*18* 41:7 42:*16* 48:*15* 52:4 86:*1*
**UNITED** 1:*1* 92:*11*
**units** 20:*3*
**University** 8:*23* 10:*4*
**unrestricted** 64:*21* 66:*3*
**untruthful** 77:*15*
**untruthfulness** 66:*21* 68:8 78:*13, 17* 79:*19*
**upgrade** 68:*1*
**upgraded** 68:*5*
**UPODA** 38:9
**usage** 31:*15*
**use** 18:*17* 19:*12* 26:7 36:*15* 40:*11* 46:*23* 57:*13*
**usually** 19:7 89:8
**utilized** 84:7, *21*

< V >
**vacation** 26:*8*
**valedictorian** 11:*11*
**validate** 28:2
**validity** 28:6
**valuations** 75:2
**various** 11:*20* 14:*15* 21:*24* 22:4 31:*4* 33:7, *11* 37:*20* 52:*23* 57:*24* 58:2 67:*1* 75:9 77:*11, 18* 78:*20* 83:*24*
**Vehicle** 30:*20*
**vehicles** 17:6 30:*4*
**verbal** 6:*11* 55:*15*
**verbally** 53:*17*
**versus** 5:5 66:*4*

**Deputy Chief Theodore John Stajura - 6/28/2018**
**Brad Sandefur vs. Sheriff of Cook County Thomas J. Dart, County of Cook, et al.**
Case: 1:17-cv-02048 Document #: 60-6 Filed: 01/03/19 Page 43 of 43 PageID #:491

**Vice** 19:*24* 20:*2, 4, 8, 9*
**viewed** 52:*9* 90:*11*
**violation** 30:*12* 77:*10, 11* 79:*11, 13, 17* 80:*11, 19* 81:*16* 82:*18, 20* 83:*3* 88:*24* 89:*6* 90:*1, 9*
**violations** 30:*9* 37:*19* 78:*4, 24* 88:*20* 89:*5, 16*
**VOLUME** 3:*2*
**vs** 1:*6*

**< W >**
**wait** 6:*18*
**waive** 91:*8, 11, 12*
**waived** 93:*2*
**walk** 31:*10* 35:*21*
**want** 8:*9* 51:*11, 12* 66:*14* 86:*13* 91:*10, 17*
**wanted** 24:*6* 33:*19* 47:*24* 48:*2, 6*
**ward** 11:*8*
**warrant** 26:*21, 23* 27:*3, 22, 23* 28:*5, 6*
**warrants** 24:*7, 10* 26:*18* 27:*8* 28:*2*
**Washington** 2:*14*
**watch** 11:*20*
**watched** 37:*15*
**way** 22:*5* 27:*22* 35:*12* 38:*5* 72:*9* 90:*14* 93:*9, 10*
**weapon** 31:*9, 11*
**Wednesday** 3:*4*
**week** 28:*1*
**weeks** 14:*10, 20* 18:*10, 24*
**well** 14:*17* 23:*13* 24:*9, 17* 33:*21* 49:*12* 56:*14* 58:*16* 60:*18* 82:*3* 85:*9*
**went** 8:*21* 18:*5* 22:*7* 23:*23* 36:*5, 12* 51:*15*
**we're** 5:*4* 12:*11* 14:*24* 30:*12, 15* 39:*23, 23* 41:*18*

**54:*2* 56:*6* 57:*7, 7, 8* 69:*3* 76:*21, 23***
**West** 2:*14*
**We've** 34:*18, 19* 67:*17* 78:*7* 90:*24*
**whatnot** 22:*19*
**WHEREOF** 93:*12*
**White** 45:*2, 9* 46:*6, 7* 48:*2* 60:*10* 61:*14*
**White's** 45:*15*
**wife** 85:*4*
**wife's** 57:*11, 12*
**WITNESS** 3:*6* 5:*1, 12* 6:*6, 7* 49:*1* 55:*9* 66:*9, 13* 90:*11* 91:*12* 92:*15, 19, 20, 24*
**witnesses** 62:*15*
**won** 66:*20*
**words** 71:*8*
**work** 9:*9, 15* 23:*20* 27:*7* 30:*19* 31:*3*
**worked** 9:*10* 20:*23* 30:*23*
**working** 9:*6* 11:*7* 20:*21, 22* 23:*24* 24:*3* 25:*23* 27:*6* 36:*20* 48:*18*
**works** 40:*1*
**Wright** 3:*23* 81:*4, 10* 84:*16*
**write** 13:*9* 55:*20*
**writing** 39:*6* 58:*2* 80:*17*
**written** 12:*16, 17* 13:*2* 17:*16* 53:*12* 66:*24* 73:*10* 81:*7* 87:*12*
**wrongfully** 57:*18, 20*
**wrote** 87:*17*

**< Y >**
**Yeah** 10:*2* 34:*16* 43:*2* 45:*22* 57:*6* 66:*16* 72:*14* 73:*21* 83:*5* 87:*21* 91:*12*
**year** 10:*24* 15:*14, 16* 16:*16* 24:*18, 19* 25:*3, 4* 30:*2* 83:*1, 12*

**years** 9:*17* 12:*2, 12, 13* 13:*19* 17:*10, 16* 21:*10* 22:*10* 28:*14, 17* 29:*11*
**Yesterday** 8:*3*
**Youngstown** 9:*14*